## No. 8728.

### SUCCESSION OF LOUIS MÜH.

### FOR PROBATE OF WILL.

The revocation of a will by the act of the testator may be express or tacit. It is express when the testator has declared in writing that he revokes the will, or a particular disposition in it. It is tacit when he has made another disposition repugnant to and inconsistent with the previous one, although nothing is said about revoking it, or when he has done any act which indicates a change of intention, whatever that act may be, provided always the intention to revoke is fairly and legally deducible from it.

Erasures not approved by the testator are considered as not made, and this applies to those erasures which are made of parts or clauses of a paper admittedly existing as a will, and not to that part, the erasure of which would destroy it as a will, such as the signature.

If the erasures do not so obliterate the words that it is impossible to distinguish them, and the Judge considers the erasures important, that is to say, of material words, he shall pronounce the nullity of the will. *Aliter*, he cannot decree its nullity.

The effacement and obliteration of the signature to a will by the testator, if done with the intent to revoke, which intent may be deduced from that and other circumstances, will have the effect of revocation. Any act defacing an existing will, done by the testator, derives its character solely from the intent with which it is done.

APPEAL from the Civil District Court for the Parish of Orleans. *Tissot,* J.

---

*A. J. & O. Villeré* and *P. E. & C. J. Théard* for Félix Ducayet, Testamentary Executor, Appellant:

1. Erasures not approved by the testator are considered as not made. C. C. 1589.
2. Testaments can be revoked only in one of the forms prescribed by law for testaments. C. C. 1691, 1692.
3. The word erasures in Article 1589 applies to the whole will. The signature is not excepted, because it is one of the constitutive parts of the will.
4. The intention of a testator, however clearly expressed, will not be considered, if not clothed with the formalities required by law. 21 An. 450.
5. Parol evidence is not admissible to prove the act of a testator, when that act must be made in a certain manner prescribed by law. The admittance of such evidence is virtually testifying to the intention of a testator. Laurent, vol. 13, p. 198 ; 9 An. 148.
6. The fact that the will is found in the papers of the deceased raises no legal presumption. Laurent, vol. 13, p. 198.
7. Wherever a will is found, the erasures are presumed to be the act of a third party, because every one being presumed to know the law, Müh would have approved any erasures made by him. 2 La 290.

*Albert Voorhies* for the heirs of Wm. Epps, Sr., on the same side :

1. The right to transmit property by testament is derived from municipal law : it is not an inherent or primordeal right. C. C. 870, (866) 1570, (1563).

The mode or method of transmission is determined and regulated by law ; and, in case of noncompliance, it is the municipal law that makes the transmission of the succession. C. C. 1467, (1453).

Such transmission by the individual can be made only by last will and testament. C. C. 1570, (1563).

2. A last will or testament, valid as to form and substance, although an act to take effect after death, is nevertheless, from the date of its execution, binding upon the testator and upon the world, subject only to be revoked by suitable act of the testator, or by effect of law. C. C. 1469, (1455).

Succession of Müh.

3. The legal revocation is independent of the intention of the testator himself, and takes place in the cases predetermined by law. C. C. 1697, (1690), 1711, (1704).

4. The right of revocation by the testator is derived from, and its exercise is likewise controlled and regulated by municipal law. C. C.1690, (1683), 1711, (1704), 1589, (1562).

5. The law provides specially how a will may be revoked; there can be no other mode of revocation than such as is recognized by law.

The whole law on this subject matter is contained in C. C. Articles 1690, (1683), 1711, (1704), and 1589, (1582); they provide for all modes of legal revocation, express and tacit.

There is no law in Louisiana providing for the revocation by actual destruction of a testament, partial or complete: but the symbolical destruction by erasure of the will, or of a legacy, is specially recognized. C. C. 1589, (1582).

The Roman, Spanish and French laws in force before the Cession of Louisiana have been repealed, and with it the complicated jurisprudence upon the subject matter of erasure, laceration, suppression and destruction of testaments. La. C. C. of 1825, Art. 3521 ; C. C. 1690, (1683), 1711, (1704), 1589, (1582).

6. Erasure is the symbolical destruction of a portion, or of the whole of a testament; it must not be confounded with its actual destruction, whether by laceration, burning, or otherwise.

The La. C. C. 1589, (1582) provides specially for the revocation by erasure; and that of itself would have disposed of the French, Roman and Spanish jurisprudence on this branch of revocation, without the aid of old C. C. 3521, absolutely repealing the whole jurisprudence itself.

7. There is a wide divergence on the subject of the revocation of testaments between the La. Civil Code and Napoléon Code.

The nine following are original Articles of the La. C. C., to-wit : 1589, [1582], 1690, [1683], 1691, [1684], 1702, [1695], 1704, [1697], 1705, [1698], 1706, [1699], 1709, [1702], and 3521.

The four following Articles of the La. C. C. contain material alterations to the corresponding Articles of the N. C. : C. C. 1694, [1687]—C. N. 1037 ; C. C. 1695, [1688]—C. N. 1038 ; C. C. 1696, [1689]—C. N. 1038 ; C. C. 1710, [1703]— C. N. 1046.

These original and amended Articles of the La. C. C. have inaugurated a policy totally at variance with the French jurisprudence.

8. But even under the French Code a writing is necessary to prove a revocation : parol presumptions and conjectures being inadmissible. Cass. 2 May, 1824, Seguy c. Chevalier.

9. The Louisiana departure from the French jurisprudence on revocation of wills, has elicited the approbation of the British Parliament. It passed the Act of 1838—of Victoria. Under the adjudications of the English Courts upon questions of actual and symbolical destruction of legacies and wills arising under that Act, the last will and testament of Louis Müh with all its erasures, would, without difficulty, be admitted by them to probate, precisely discarding the erasures.

*Breaux & Hall* for P. S. Wiltz, Public Administrator, and *Kennard Howe & Prentiss* for one of the heirs of Louis Müh, *contra :*

1. The presumption of law is that cancellation of a will was made by the testator when that will is found in his possession. 11 N. J. Eq. (3 Stock.) p. 156 ; Redfield on Wills, 307, 308 ; 1 Coll. p. 638 ; 2 Penn. St. 110 ; 1 Lee Eccl. R. 444 ; 3 Hogg. 568 ; 25 An. 103 ; Redfield, 350 ; 10 Yerger, 84 ; 11 Ala. 596 ; 6 Wend. 174 ; 11 Wend. 227 ; 2 Pick. 67.

2. Parol is admissible to prove that a mutilated will was destroyed by the testator. Laurent, XIV, pp. 268, 271 ; 32 Ga. 156.

3. The burden of proof that the testator did not make the cancellation is on him who seeks to probate the will. Laurent, XIV, p. 265 ; 6 N. S. 264 ; 25 An. 103 ; 1 Redfield on Wills, 350 ; 10 Yerger, 84 ; 11 Ala. 596 ; 6 Wend. 174 ; 11 Wend. 227 ; 3 Pick. 67.

4. A testator may destroy his olographic will in any manner he pleases. 45 Barbour, [N. Y. ] 438 ; 2 Conn. 67 ; 5 Mon. [Ky.] 58 ; 7 Har. and J. [Ind.] 388 ; 4 Mass. 460 ; 15 Pick. [Mass.] 388 ; 2 Murphy, [N. C.] 235 ; 5 Bush. [Ky.] 337 ; 65 Mo. 432 ; Roquion, Art. 970 ; Boileux, vol. 2, p. 335 ; Marcadé, vol. 4, p. 7 ; Laurent, vol. XIV, 262.

5. But there must be an intention, combined with some act.    2 A. K. Marsh, (Ky.) 71, No.
    190; 9 Cowden, (N. Y.) 208; 2 Yeates, (Pa.) 170, No. 511; 3 McCord, (S. C.) 282; 7 Johns.
    (N. Y.) 394; 2 Head. (Tenn.) 104, 303.
6. Every act of cancellation imparts *prima facie*, that it is done with the intention to revoke.
    63 Ills. 368; 25 N. J. 501; IX Duranton, 471; Gilbert, 485; Laurent XIV, p. 263.
7. Art. C. C. 1589, [1582] does not apply to erasures of the signature.

*J. L. Tissot*, Attorney for absent heirs, on the same side.

The opinion of the Court was delivered by

MANNING, J.  On May 4, 1875, Louis Müh made his olographic will in due form, and died November 13, 1882.  A notary placed seals upon his effects on the day of his death, and put a guardian over them.  A few days after, this officer in the presence of witnesses removed the seals, and made search for a will.  A bureau, secretary, and some trunks were searched without success.  A table stood in the bedchamber of the deceased, the drawer of which was locked.  This drawer had also been sealed by the notary.  The key broke in the effort to unlock it, and it was opened by a locksmith.  In the drawer was found an envelope, superscribed—" Ceci est mon Testament Olograph Pour être ouvert après mon Décès," underneath which was his signature with a paraph. This envelope had once been sealed with three wax seals.  They had been broken.

The paper within was presented for probate as the will of the deceased.  The *procès verbal* of the notary recites all the particulars with lengthy detail; and among them that in the drawer were " memorandums which indicate the making of a later will by said deceased."

The will is written on a sheet of legal cap, the writing covering three pages and nearly half of the fourth.  It commences thus:

" Ceci est mon Testament Olograph.   Je soussigné Louis Müh sain de Corps et D'Esprit," etc., etc.   Then follows over twenty legacies, and a final distribution of the residuum of his estate among these legatees.

All of these legacies, except four, had been erased by drawing a line of ink through them, but the words can be read.  The clause in which his executors are named is erased in like manner, and their names are more obliterated than the other parts of that clause, the pen evidently being pressed harder and with a more copious flow of ink.  The paper had been signed, and the signature is covered with ink, the erasing pen having been moved in several ways, and with various and different strokes, which extend over the paraph.   A minute inspection reveals the name to those who know what it was already.   Experts state on the trial they can see both the signature and the paraph through the superimposed ink.   It would be difficult to blotch it more, but portions of the capital letters of the name appear when the eye has

rested some time upon them. The ink of the erasures is blacker than the writing.

The first legacy is to his former slave, William Epps, and is not erased. The other three unerased legacies are to his sister Elizabeth, and his niece Melanie, widow of Henri René, and another niece Eugenie Cocheteux. On the margin, outside the colored line on legal cap, and abreast each legacy to the nieces, is written with a paler ink, "fille de ma sœur Elisabeth," manifestly written at a different time from the will, and as additionally descriptive of the person intended. A like marginal description is abreast the partially erased legacy to Eugenie Ducayet, the name "Jenny" being there written, and the unerased part of her legacy is his book case, "ma Bibliothèque sans le contenu." These indicate unmistakably that when he was reading the will over with a view to make another, he revised it, and added these descriptive words to be put in the new will.

There is other and stronger internal evidence that his own hand made these erasures and blottings.

The only parts of the will, except these legacies, that are not erased are the exordium as first above given, and the conclusion where he revokes all previous wills, disinherits any heir who shall attack his will, prays God to receive his soul, etc., etc., all of which remained because he wished to insert them in his new will, and the form of words was left intact to be copied. And finally the most significant marginal correction or addition occurs here. After Je prie Dieu d'agréer mon âme follows immediately au nom du père, du fils, et du St. Esprit. He felt there was something lacking, and he wrote in the margin et du, scratched it, and then, ainsi soit-il amen, making a X mark between the above two sentences to shew the place of insertion.

That his intention was to annul the will, make it void and of no effect, cannot reasonably be doubted. The painstaking and elaborate defacing and blotting out the signature was the act which, to his apprehension, destroyed it as a will. The obliteration of the names of the executors was almost as complete, but the legacies that were not intended to be repeated had simply an ink line drawn through them, and the sentences that were untouched received marginal additions as memoranda, or were left entire for use in copying.

It will be observed we have paid no attention to the testimony of the three women of his declarations touching his having revoked his will, because their testimony was objected to on the ground that it was parol (upon which we make no ruling) and for the better reason that, if admissible, it adds nothing to the force of the internal evidence of the paper itself.

It is contended that, whatever may have been the intention of the tes-

tator in making these erasures and obliterations, conceding they were made by himself, yet they do not revoke the will because the Code has provided the several modes of revocation, of which this is not one, and the erasures must be considered as not made, because they were not approved by the testator. And the argument is elaborated and extended until it culminates in this extraordinary proposition, that the destruction of a will by the hands of the testator *animo revocandi* is not a legal revocation. Says the brief on behalf of Epps :

"It is simply making it impossible to produce and probate the destroyed or suppressed instrument, unless perchance parties in interest should procure secondary proof, sufficient for the purpose. Hence, testators usually resort to this mode of getting rid of—not of legally revoking their will."

It is however correctly asserted that the intention to revoke may have existed, but if not legally effected, the instrument remains a will, and Hollingshead vs. Sturgis, 21 Ann. 450, is cited as establishing that a will was not revoked by another, subsequent in date, which latter was invalid for want of form, although the intention to revoke was energetically expressed in the later instrument. The doctrine is not new, and may be found in any of the books on Wills, and with a distinction therein drawn as to the purpose and effect of the act of revocation very pertinent to the matter in hand. Thus :

"But if the testator revokes his will upon the mere general purpose of thereafter making another, it will not hinder the revocation becoming effectual because he dies without carrying such purpose of making a new into effect. Williams vs. Tyley, Johns Eng. Ch. 530. It is only where the testator revokes a former will, upon the supposition that he has executed a subsequent valid will, which proves invalid, that the act of revocation is held incomplete. 1 Redfield on Wills, *308.

The Code declares that a revocation of a testament by the act of the testator may be express or tacit, general or particular. It is express when the testator has formally declared in writing that he revokes his will, or a particular disposition in it. It is tacit when it results from some other disposition of the testator, or from some act which supposes a change of will. Rev. Civ. Code, Art. 1691 (1684).

The meaning is plain. If the testator has made another disposition, repugnant to and inconsistent with the previous one, although nothing is said about revoking the former, a tacit revocation will thereby be made. So also if he has done any act which supposes a change of will, let that act be what it may, provided always the intention to revoke is fairly and legally deducible from it, a tacit revocation will result from the act.

With language so unambiguous as the text of the Code before us,

the argument upon it is startling. It can be epitomised thus: The word act does not mean act in the sense of something done, a deed, or such like, but an act, that is to say, a testamentary instrument. It is defined in the next Article which reads, the act, by which a testamentary disposition is revoked, must be made in one of the forms prescribed for testaments and clothed with the same formalities. In the words of the brief: "that is the general rule both as regards express and tacit revocation. There must be a writing, and the instrument must have all the elements of a valid will."

By this reasoning it. follows,—when the Code enacts that a revocation of a will may be express or tacit, it means by express, a formal declaration in writing to that effect; and by tacit, a declaration still more formal, viz., a testamentary act.

A similar perversion of Art. 1589 (1582) is urged. By that Article erasures not approved by the testator are considered as not made, and it is insisted that this applies to the erased signature equally as to erased legacies. No particular method of approval is specified, nor does it seem essential that approval shall be indicated by writing, in which respect our Code differs from the English statute of Wills. There is no indication of the testator's approval of the erasures other than the approval which erasure by his own hand manifests. But it is apparent the Article is not treating of the erasure of a signature to a will. The erasures, which are considered not made if not approved, are those which change or strike out parts or clauses of a paper recognised as an existing will, not that part, the erasure of which would destroy it as a will. Erasures of clauses in the body of the will affect only the dispositions erased. Erasure of the signature strikes at the existence of the instrument as a will.

The same Article further provides: if the erasures are so made as to render it impossible to distinguish the words covered by them, it shall be left to the discretion of the judge to declare if he considers them important, and in this case only to decree the nullity of the testament.

All the numerous counsel treat the adjective "important" as qualifying "words." On one side it is urged that the signature is a word, and since the judge has discretion to declare if he considers that word important, the erasure of the signature is not more significant than the erasure of an ordinary word. It would be remarkable indeed if the Code in any place had treated the signature to a will, even by implication, as a thing the importance of which varied with the discretion of judges, since it emphatically attaches so much importance to it that signing an olographic will cannot be dispensed with.

It is not the *words* that the judge must consider important, but the *erasures*, as is evident when we observe that only in the case of their

being important can he decree the nullity of the will. The Article can be paraphrased thus : if the erasures so obliterate the words that it is impossible to distinguish them, and the judge considers the erasures important, that is to say, of material words, he shall pronounce the nullity of the will, but if he considers these erasures unimportant, he cannot decree nullity.

And thus erasures are recognised as one of the acts which will operate a revocation of a will. This might have been expected, since it is the law both in England and France, the two countries whose legislation and jurisprudence have moulded our own.

But it is argued that the contrary is the true interpretation, and in this wise. Before the adoption of the Napoleon Code, the provinces of France had different laws, and different customs which had the force of laws. Some of the provinces had the *droit écrit*—others the *droit coutumier.* · The Napoleon Code produced a uniform law for the whole country. A voluminous jurisprudence was developed upon the subject of tacit revocation of wills, and there were conflicting opinions of commentators, approving or antagonizing the decisions of the Court of Cassation upon the revocation of wills by erasure, laceration, suppression, or destruction. These decisions were founded upon the Roman law, which had not been expressly repealed. Now, Art. 3521 of the Code of 1825 enacts that the Spanish, French and Roman laws, which were in force in this State formerly, are repealed and shall not be invoked as laws even under the pretence that their provisions are not contrary to that Code. *Ergo* all the French jurisprudence touching the revocation of wills by erasure, laceration, etc., is altogether inapplicable here, because our Code has not provided for the revocation of wills by such means.

· This is what logicians call *petitio principii.* The Code has provided for the tacit revocation of wills, and that provision is of the most enlarged and comprehensive kind, viz., by any act that denotes a change of intention. Of course, the acts are not specified. They could not be. They are as numerous and as varying as the different circumstances under which men act on such occasions. The compilers of our Code were careful to omit even the classification of these kinds of acts into erasure, laceration, suppression, destruction, etc. Those clashing commentaries, in which jurisconsults had invented the most subtle distinctions, were before them, and they therefore formulated a general rule, leaving to courts, of necessity, to apply it to each particular case that fell within its scope.

How could it be otherwise ? How could any community or people 'get on with a law that declared the perpetuity of a will, unless revoked by an act as solemn as that by which it was made ? That although a

will is ambulatory and has no effect until death, yet when once made it is irrevocable by any act of destruction, or defacing, or cancellation. That is the contention of the attorneys for the will.

The French authorities are full to repletion with discussions upon the revocation of wills by different acts, such as those heretofore mentioned. XIV Laurent, pp. 268, 271; Rogron, Art, 970; 2 Boileux, p. 335; 4 Marcadé, Art. 290; IX Duranton, p. 471. As to the proof of laceration, etc., XIV Laurent, pp. 262, 265. One quotation only will be made, and that because it expresses what we have enforced above. Duranton writes: " Il y a révocation tacite lorsque de nouvelles dispositions, sans révoquer expressément les précédentes, sont néanmoins incompatibles avec elles; ou bien encore lorsqu'il résulte de certains *faits généralement désignés par la loi*, que le testateur n'a pas persévéré dans sa volonté de maintenir ses premières dispositions." Tome IX, Art. 427.

The contention is that these French legists cannot be followed in interpreting our law, but the modern English decisions may be consulted, because " the Louisiana departure from the French jurisprudence on revocation of wills has elicited the approbation of the British Parliament." The statute of Wills was passed in 1838, and it is confidently asserted, " under the adjudications of the English courts upon questions of actual and symbolical destruction of wills arising under that Act, the testament of Louis Müh with all its erasures would without diffculty be admitted to probate, precisely discarding the erasures."

Here then we stand on solid ground, and to these decisions we will now resort.

In the recent case of Woodward *in re*, Lord Penzance placed the point of ascertaining the precise purpose of a testator in tearing, cutting, or obliterating any particular portion of a will very clearly. The summary of the doctrine is, if such obliteration, etc., is confined to a particular bequest, the rest of the instrument remaining perfect, the natural conclusion might be reasonably clear, that all the will was intended to remain operative except the particular portion obliterated or defaced; while on the other hand, if the burning, tearing, cutting, or obliteration is made upon an essential portion of the instrument, *as the signature of the testator*, or if made generally upon the body of the instrument without regard to any particular provision contained in it, the natural conclusion would be that the whole instrument was intended to be destroyed. 1 Redfield on Wills, *332, 56.

When there are erasures and interlineations on the face of a will, the presumption that they were made before execution does not arise as it does in the case of deeds. The presumption is that these erasures,

etc., were made by the testator with a view to the ultimate republication of the instrument in its altered form.    Ibid, c. vii, Sec. 2, 23.    In regard to the construction of the word " tearing," it has been held to include cutting.    It need not be the cutting up of the whole will.    Any part cut out, as the name of a legatee, will be a revocation *pro tanto.* And the cutting out of the principal part, *as the signature of the testator will be a revocation of the whole will.*"    1 Jarman on Wills, 161 and 132,. note 1.

A will was found in a wrapper (envelope) in the testator's locked drawer with other papers, and had been cut in two pieces immediately above the signatures of the witnesses and of the testator, but both parts preserved, Sir Creswell Creswell said, "I cannot come to the conclusion that the deceased did not mean to revoke his will by thus cutting it."    *Re* Simpson, 5 Jur. N. S. 1366.    Put erasure for cutting, and there is the present case.

Where the will was found with another testamentary disposition, but the place in which the names of the attesting witnesses should have appeared upon the latter was scratched over with a pen and ink, so that no letter of a name could be deciphered, it was held that this paper was thereby revoked, and the will was admitted to probate alone.    James *in re,* 7 Jur. N. S. 52.    Where one had executed his will as a sealed instrument, and tore off the seal *animo revocandi,* it was held a sufficient revocation, notwithstanding the statute did not require a seal.    And this case was cited with approbation by Vice Chancellor Wood, a high authority, when he decided that a testator, having torn off the signature from the first four sheets of his will, and struck his pen through the signature upon the remaining sheet, the *animus revocandi* being established, it was a sufficient revocation. Williams vs. Tyley, Johns Eng. Ch. 530.

The rule in regard to presumptive revocations, from the mutilation of the will, seems to be that if the will is traced into the testator's possession and custody and is there found mutilated in any of the modes pointed out by the statute, it will be presumed the testator mutilated it *animo revocandi.*    1 Jarman on Wills, 124.

A case is cited in one of the briefs as Harris *in re,* 2 Law Rep. Prob. Div. 251, where a testator drew his pen through the lines of various parts of his will, wrote on the back of it " this is revoked," and threw it among a heap of waste papers in his sitting room.    A servant took it up and put it on a table in the kitchen.    It remained lying about in the kitchen till the testator's death, seven or eight years afterwards, and was then found uninjured ; held, that the will was not revoked, the words " or otherwise destroying " in the statute not being satisfied, as, whatever the testator intended, the will had not been actually injured.

If the *animus revocandi* is to control, it is difficult to justify that decision, and *per contra* Lord Chief Justice DeGrey said: The statute has specified four modes of revocation, and if these or any of them has been performed in the slightest manner, this joined with the declared intent will be a good revocation. Throwing the will on the fire, with an intent to burn it, though it is only very slightly singed and falls off, is sufficient within the statute. Bibb vs. Thomas, 2 W. Bl. 1043; Hyde vs. Hyde, 1 Eq. Cas. Ab. 408–9.

The American Courts, in this matter as in so many other of construction, have interpreted laws with an enlightened and liberal spirit, and have held in numerous cases that any act defacing an existing will, done by the testator, derives its character solely from the intent with which it is done, and therefore when the testator has done an act with the intention of revocation, and is deceived into the belief that he had destroyed his will, when in fact it was not destroyed, the act done shall have the effect of revocation. 1 Redfield on Wills, p. *318, 30, 31.

Finally, it is insisted that, even if the signature at the end of, or beneath the will, is obliterated, the Code does not prescribe where a will shall be signed, and as the testator wrote his name in the first sentence, and also signed the superscription on the envelope, these or either of them is a compliance with the requirement that an olographic will must be signed by the testator.

Signing a superscription on an envelope cannot be deemed a signing of the will, and as to the written name in the first sentence, unfortunately for the pretension, the testator wrote, I, the undersigned Louis Müh, etc., and the under signature was effaced and obliterated by commingled scratches, circles, and blotches of ink.

This effacement and obliteration as we see it in the original brought up with the record, was in our opinion done with the intent to revoke the will, and this intent should be given effect to by the Court. The lower court so held.

Judgment affirmed.

### On Application for a Rehearing.

The brief on application for rehearing renews the arguments of those on the hearing, all of which had already been considered and answered, without throwing additional light upon the questions which we had discussed with elaboration, and decided only after a painstaking study of the whole subject.

The brief informs us that our quotation of an Article of the Code is correctly made from the Revisal of 1870, but that a single word was excerpted by the legislation of the following years. As it does not

affect the argument in the slightest degree, we have expunged the word.

. We are also told that one of the authorities cited from the English courts antedates the statute of Victoria. If this be so, it does not detract from the force of the other English decisions cited, but it may not be amiss to say that the editions of Jarman and Redfield we consulted are the latest (one of 1876 and the other of 1881) and in their chapters on the Revocation of Wills, treating the law of England as it is at this moment under the statute of Victoria, that case is cited there as it is by us. It is scarcely credible that the latest editions of these standard works, one of them annotated by competent editors, should contain citations of cases inapplicable to the present state of the law in that country.

The rehearing is refused.