975 So.2d 738 (2008)
In the Matter of the Succession of Emile Joseph DOUCET, Jr.
Beverly Sanders Doucet, Plaintiff-Appellant
v.
Dane Daryl Doucet, Defendant-Appellee.
No. 42,963-CA.
Court of Appeal of Louisiana, Second Circuit.
February 6, 2008.
Rick Lane Candler, for Appellant.
Donald L. Kneipp, Monroe, for Appellee.
Before WILLIAMS, STEWART and MOORE, JJ.
*739 MOORE, J.
Beverly Sanders Doucet appeals a judgment that refused to probate a copy of the notarial will that her late husband executed naming her his sole universal legatee. Finding no manifest error in the district court's conclusion that the decedent revoked his will by destroying the original, we affirm.

Factual Background
The decedent, Emile Joseph Doucet Jr. (referred to by his family as "EJ"), was a lifelong resident of Lincoln Parish. He was married twice, first to Bettye D. Collins, from whom he was divorced; of this marriage he had one surviving child, Dane Daryl Doucet, who was born in 1972. Dane admitted that he and his father had a strained relationship; he had not been to EJ's house since 1995 or 1996, and not spoken to him since 2000. According to two of EJ's friends, Horace "Dupey" Cobb and Robert Lonadier, EJ was convinced that Dane had stolen money from him and often declared emphatically that he wanted Dane to get nothing from him. EJ's mother, Mary Simpson, testified that she tried to intervene and reconcile her son and grandson, but EJ would not budge.
EJ married Beverly in September 2001, but she did not immediately move in with him. She testified, and other witnesses confirmed, that EJ was cantankerous, solitary and given to drink. After she moved in, in the summer of 2002, EJ disliked how she redecorated the house and, according to some witnesses, despised Beverly's dog. Beverly testified that she moved out in February or March 2004, but only because EJ really liked his solitude and had rather asocial habits.[1] Beverly insisted, nevertheless, that there was no change in their loving relationship.
EJ executed a notarial will on March 6, 2002, naming Beverly as his sole universal legatee; in the alternative, should Beverly predecease EJ, Dane was to get everything. Andrew Shealy, an assistant district attorney for the Third Judicial District Court, prepared the notarial will but had no personal recollection of it. His file showed that rather than handing the will directly to EJ after the execution, Shealy mailed it about a week later, and Beverly paid his fee. Beverly testified that in keeping with their usual practice, she wrote a check to Shealy but EJ reimbursed her in cash.
EJ's health seriously declined in 2005. His mother, Mrs. Simpson, persuaded him to go to the hospital on Monday, October 10, 2005, but his condition was terminal and he died there on Friday, October 14, at age 69.
The following day, Beverly told Dane at the funeral parlor that EJ had written a will leaving her everything; according to Dane and Mrs. Simpson, this was the first they ever heard of a will. Beverly and Mrs. Simpson rode together to a flower shop and department store, and then to EJ's house, to make further arrangements; Dane met them there. All agree that on arrival, Mrs. Simpson could not get the house key to open the front door, but that Dane took it from her, went to the garage, gained entrance and let the ladies in the front. This point was significant because at trial Beverly argued that before she arrived, Dane must have entered the house, ferreted out the will and destroyed it, an accusation that Dane vehemently denied.
*740 Once inside, the ladies went to EJ's office, where Mrs. Simpson opened his lockbox and removed his checkbook. Meanwhile, Beverly opened the unlocked strongbox where she and EJ kept important papers, including his will. She took it out and showed it to Dane and Mrs. Simpson, who immediately dismissed it as just a copy because the notary seal was not embossed. Beverly recalled that Dane dismissed the will before he looked at it, stoking her suspicion that he had slyly spirited off the original. Mrs. Simpson also told Beverly that the signature on the copy did not look like EJ's, and that she (Beverly) must have got him drunk to induce him to sign it. However, according to Beverly, Mrs. Simpson admitted thinking that EJ would leave her (Beverly) "all his money." Despite the tension, they apparently finished EJ's last rites without further incident.[2]
Shortly after EJ died, Dane filed a petition to appoint a notary to search for a will. Beverly responded with the instant petition to probate the copy, which she contended was valid because EJ had never revoked the original. Dane countered that because no original was ever found, EJ was presumed to have destroyed and revoked it.

Action of the District Court
The case was tried over two days in June and August 2006, with the evidence as outlined above. In addition to her own testimony that EJ was adamant about leaving nothing to Dane, Beverly called two of EJ's friends, Cobb and Lonadier. Both confirmed that EJ was estranged from his son and often said he did not want Dane to receive anything; Cobb testified that EJ left a will to that effect.[3] Dane, however, called another friend of EJ's, Theresa Harrell, to whom EJ confided that he planned to get a divorce. According to Ms. Harrell, EJ often said there were four people he did not want at his funeral, two of whom were Beverly and Dane. Mrs. Simpson testified that her son built his house on the old family homeplace, part of a tract which her great-grandfather had homesteaded back in the 1800s. She obviously wished to keep this land "in the family."
In written reasons for judgment, the court outlined the facts, procedural history and applicable law, specifically the rule that if no original will is found, the testator is presumed to have destroyed and revoked it. La. C.C. art. 1607(1); Succession of Talbot, 530 So.2d 1132 (La.1988). The court held that the proponent of the copy must show by clear and convincing evidence that the testator did not revoke the testament. Succession of Bagwell, 415 So.2d 238 (La.App. 2 Cir.1982). Beverly proved that EJ executed a will in proper notarial form, but failed to prove that he did not revoke it. EJ definitely received it, as shown by Shealy's records, but it was never found, and the evidence was not convincing that Dane, Mrs. Simpson or anybody else destroyed it. "One simply does not know what happened to the will." As for Cobb's testimony that EJ said he was leaving everything to Beverly, this was credible but EJ had ample time after that statement to change his mind. Similarly, Lonadier's testimony was credible but not probative: just because EJ said he did not want Dane to get anything did not mean he wanted Beverly to get it. Reiterating *741 that "it is not clear what became of the will," the court rejected Beverly's claim for probate.
The court rendered judgment declaring the copy of EJ's will invalid and dismissing Beverly's petition to probate it. Beverly appealed.

Discussion
By one assignment of error, Beverly urges the court erred in ruling that she failed to prove by clear and convincing evidence that EJ did not revoke the will. Contrary to the court's findings, she contends that Mrs. Simpson never said her son spoke of divorcing Beverly; rather, he only said Beverly "wasn't a wife to him." She also cites the testimony of Lonadier, who said EJ was adamant that Dane would not get anything. She concludes that it was unreasonable to find that EJ would destroy his will, knowing that his property would go to Dane by intestacy, when just days before his death he vowed that his estranged son would not get any of his estate. Finally, she shows that the court affirmed the probate of a copy of a will in Succession of Hatchell, XXXX-XXXX (La. App. 1 Cir. 11/7/03), 868 So.2d 36. She requests a judgment admitting the copy to probate.
Dane responds that the court's findings are subject to manifest error review and that the proponent of a copy of a will must meet a remarkably heavy burden of proof. In support, he cites Succession of Justice, 28,363 (La.App. 2 Cir. 8/23/96), 679 So.2d 597, a case involving revocation by a subsequent, formally invalid will. A duplicate is admissible to the same extent as an original "unless * * * the original is a testament offered for probate." La. C.E. art. 1003(3). Dane reiterates that EJ's will arose under suspicious circumstances, and even if it was valid, the evidence did not rebut the presumption that he destroyed it. He suggests that Cobb and Lonadier, while they tended to support Beverly's position, were inconsistent and unpersuasive, while Mrs. Simpson and Ms. Harrell clearly showed that on the eve of his death EJ was most unhappy with Beverly. In support, he notes that EJ did not even give Beverly a key to the house or allow her to sign his checks. Dane seeks affirmance.
A testator may revoke his testament at any time. La. C.C. art. 1606. Methods of revocation are outlined in La. C.C. art. 1607:
Revocation of an entire testament occurs when the testator does any of the following:
(1) Physically destroys the testament, or has it destroyed at his direction.
(2) So declares in one of the forms prescribed for testaments or in an authentic act.
(3) Identifies and clearly revokes the testament by a writing that is entirely written and signed by the testator in his own handwriting.
When a will cannot be found at the testator's death, there arises a presumption that the testator destroyed the will with the intention of revoking it. Succession of Talbot, supra; Succession of Bagwell, supra. The presumption may be rebutted by clear proof (1) that the testator made a valid will, (2) of the contents or substance of the will, and (3) that the will was not revoked by the testator. Succession of Justice, supra, and citations therein. The proponent of such a will assumes the burden of demonstrating that the testator did not intend to revoke it by destroying it. Succession of Talbot, supra. Clear and convincing proof that a person other than the testator destroyed the will without the direction, consent or permission of the testator would be sufficient to overcome the presumption that the testator *742 revoked the will by destroying it. Succession of Bagwell, supra.
The district court's findings of fact regarding the presumed revocation of a will by destruction are subject to manifest error review. Succession of Justice, supra.
After close review of this dense record, we are unable to detect any manifest error. EJ executed a will in March 2002; after his death 3½ years later, the original could not be found. Although Beverly has not specified it as error on appeal, we can only confirm the district court's finding that the evidence does not show, one way or the other, what happened to the original. Although there may have been a window of opportunity, while EJ was at Lincoln General for his final illness and in the 24 hours after his death, for Mrs. Simpson or Dane to enter the house, locate and destroy the will, these are only circumstances and do not approach the clear and convincing proof needed to show that someone other than EJ destroyed it. As observed by the district court, we simply do not know what happened to that will. This activated the legal presumption that EJ himself destroyed and revoked it. Succession of Talbot, supra.
Beverly strongly relies on Lonadier's testimony that, just a few days before his death, EJ said he did not want Dane to inherit anything. This conforms with everybody's view that EJ had an antagonistic relationship with his son. However, it does not rise to the level of clear and convincing proof that he would not have revoked the will that favored Beverly. Mrs. Simpson admitted that her son never used the word "divorce," but a fair reading of her testimony is that EJ was very unhappy with Beverly and did not consider her a companion. Another witness, Ms. Harrell, explicitly recalled that EJ said it was "about time for a divorce." These are sentiments that would support his inclination to revoke the will. We can only speculate whether EJ was less unwilling to let Beverly or Dane inherit his estate.
The evidence does not rebut, by clear and convincing proof, the presumption that EJ himself destroyed and revoked the will. The district court was not plainly wrong in refusing to probate the copy.

Conclusion
For the reasons expressed, the judgment is affirmed. All costs are to be paid by the appellant, Beverly Sanders Doucet.
AFFIRMED.
NOTES
[1] Witnesses confirmed, for example, that EJ did not allow friends and family to use his bathroom; in an obsession to conserve water, he made them go to the back yard to relieve themselves.
[2] A confrontation occurred, however, about six weeks later, when Dane angrily called Beverly several offensive sexual epithets and Beverly lunged at him, grabbing his face. Witnesses had different views of who provoked whom in that spat.
[3] Cobb also thought that EJ intended to leave him (Cobb) two antique pistols.