SUCCESSION OF STEVE
ANTHONY PILET

*      NO. 2025-CA-0296

*      COURT OF APPEAL

*      FOURTH CIRCUIT

*      STATE OF LOUISIANA

*

*

* * * * * * *

**MORIAL, J., DISSENTS AND ASSIGNS REASONS**

I respectfully dissent from the majority opinion. In my view, the presumption of revocation in this case is weak. The testimony introduced at trial demonstrates that Decedent was a loving, family man. He cared for his wife Cheryl Cosse Pilet who suffered several medical and physical deficits, provided for her financially after his death, and enjoyed a close relationship with his siblings. He also had a special relationship with his godson, Shane Raimer and his family. There was no evidence introduced at trial that Decedent intended to favor any of his family members to the exclusion of the others. Instead, the evidence illustrates that the Decedent intended to provide for each of them upon his death.

I first take issue with the trial court's credibility determination as to Appellant, Kathi McDonald. She petitioned the Court to open Decedent's succession in order to gain ownership of the property she and her siblings had inherited from their parents. According to Tara Fezekas King, Cheryl Pilet "had no desire or need to do a succession because we weren't trying to figure out who was going to get Cheryl's house and when."[1] Upon the advice of counsel and pursuant to La. C.C.P. art 2853, she attached a copy of the unsigned will to her petition. La. C.C.P. art. 2853 provides:

---

[1] Ms. King opined that the Pilet siblings wanted to take the house from Cheryl Pilet after realizing that Appellant McDonald opened succession. Yet, Cheryl Pilet was the beneficiary of that process, receiving full ownership of the home as a result. Moreover, Appellants did not file the Petition to Reopen Succession until after Cheryl Pilet's death.

A. If a person has possession of a document purporting to be the testament of a deceased person, even though the person believes that the document is not the valid testament of the deceased or has doubts concerning the validity of the testament, the person shall present the document to the court with a petition praying that the document be filed in the record of the succession proceeding.

**B. A person presenting a purported testament to the court shall not be deemed to vouch for its authenticity or validity, nor be precluded from asserting its invalidity.** (emphasis added).

Part B, of the article is particularly relevant here. The law affords Appellant McDonald the right to present the unsigned will to the court without taking a position as to its veracity. Her belief as to validity or invalidity of the document is immaterial. It was the province of the trial court to examine it and make the ultimate determination. In the instant matter, Mrs. McDonald's credibility should not have been challenged for simply complying with the above-cited code article.

She also testified that she did not search Decedent's home for the will, but contacted Decedent's longstanding legal counsel, Ms. Petruccelli for a copy. Tara Fezekas King and Shane Raimer both testified that shortly after Decedent's death, they searched the home and were fully transparent with the Pilet family upon discovering the unsigned copy of Decedent's will. It is unclear what further action Appellant McDonald should have taken vis-à-vis locating Decedent's will.

The trial court also reasoned that Appellants did not offer affirmative evidence that Decedent's will was destroyed during Hurricane Katrina. While the majority is correct that there is no objective evidence that Decedent's will was destroyed in Hurricane Katrina, there is also no objective evidence that he himself destroyed it, or directed someone to destroy it on his behalf. Furthermore, the onus is not on the Appellants to prove that Decedent's will was destroyed by a catastrophic storm, but to establish that the "testator did not intend to and/or did not revoke the will by destroying it." *See Succession of Talbot*, 530 So.2d 1132, 1135 (La. 1998).

In a previous succession matter, this court affirmed that the presumption of revocation was weak because there was no evidence in the record that the testator destroyed her testament, that she ever expressed an intention to revoke her will, or that she ever treated any copy of the will as being revoked. *Succession of Foster*, 19-0209, p. 6, (La. App. 4 Cir. 7/31/19), 363 So.3d 505, 510. In *Foster*, the evidence established that in addition to the original will Decedent had in her possession, the attorney that drafted her will retained a copy in her possession. *Id.*, 19-0209, p. 7, 363 So.3d at 510. Similar circumstances occurred in the case at bar. As the court reasoned in *Foster*, it is also possible from Hurricane Katrina to his death, Decedent could have reasonably believed that his attorney still retained a copy of his will if his had been inadvertently destroyed in the storm or somehow misplaced. *Id.*

The trial court's reliance on the fact that Decedent had not spoken to anyone about the will in ten years somehow indicates that he revoked his will is also problematic. The majority cannot and does not cite to any case law that stands for the proposition that a testator's silence as to his will and its contents for a specified period of time demonstrates an intention to revoke it. Instead, the law requires affirmative conduct on the part of the testator to prove revocation. La. C.C. art. 1607 provides the following:

> Revocation of an entire testament occurs when the testator does any of the following:
>
> (1) Physically destroys the testament, or has it destroyed at his direction.
> (2) So declares in one of the forms prescribed for testaments or in an authentic act.
> (3) Identifies and clearly revokes the testament by a writing that is entirely written and signed by the testator in his own handwriting.

No such conduct on the part of the Decedent is evident from the trial record. Every single witness who testified at trial had something substantial to lose or to gain

depending on whether the trial court determined if the signed and notarized copy of Decedent's will was valid, except his attorney, Tracy Petruccelli.

Ms. Petruccelli testified that although Decedent did not speak with her about the will after 2004, if he intended to revoke his testament, he would consult her, just has he had on various legal matters that she continued to assist him with prior to his death. She stated:

> He thought he was set. That's right. He thought he had done what he needed to do. He didn't keep changing it. He wasn't a person who kept coming back to change it over and over again. He knew what he wanted, and he wrote it the way he wanted.

The legal relationship between Decedent and Ms. Petruccelli, as well as his relationship with her mother, Mary Petruccelli, spanned thirty years and is well-established in the record. Mary Petrucelli also performed legal work for Decedent and his family. Until his death, he still sought advice from Tracy Petruccelli on various legal matters. It is incongruous that he would consult her as to minor matters, yet not seek her advice on such a drastic legal decision.

Moreover, none of the testimony offered at trial contravenes Ms. Petruccelli's account, not even the testimony of Shane Raimer. While the record is replete with evidence that Shane Raimer, his godson, shared a special relationship with Decedent, Shane was unaware that Decedent made a will. Also, there is no dispute, as Shane testified, that Cheryl Pilet was the most important person in Decedent's life. Decedent's commitment to his wife for over thirty years, as well as his making substantial financial provisions for her after his death, is well documented. Cheryl Pilet was the beneficiary of his life insurance policy, the recipient of the money left in his bank accounts, and she received a substantial amount of cash which he directed Shane to deliver to her upon his death. Further, the legacy in Decedent's will, giving Cheryl Pilet usufruct over the home, guaranteed her housing for the remainder of her life.

Also, his legacy to Shane ensured that his wife would not be burdened with his business, considering her physical and mental ailments. All of these acts by the Decedent support Shane Raimer's contention that Cheryl was the most important person in Decedent's life. These acts also support the testimony that Decedent was a savvy business man, and he was careful and deliberate in crafting his last wishes.

The love Decedent had for his wife does not negate the love he had for his siblings. The two are not mutually exclusive. Most importantly, neither the trial court nor the majority can point to any objective evidence in the trial record that demonstrates that Decedent at the end of his life decided to favor his wife to the exclusion of his siblings, and as a result revoked his will.

Instead, the evidence demonstrates that Decedent clearly communicated his last wishes to his loved ones, while trusting that his legal representative would enforce them. He informed his siblings that he had written a will. Decedent repeatedly told Shane Raimer that he would inherit his share of the business, and made his siblings, other family members and business associates aware of that fact. If Decedent had revoked his will prior to his death to favor his wife over his siblings, his legacy to Shane Raimer, would also have been revoked. There is no evidence entered into the record that would support this outcome. In contrast, the evidence establishes that he had a loving and close relationship with his siblings, his wife, Cheryl Pilet, his godson Shane Raimer, and made provisions for them all.

Most importantly, the record is devoid of any evidence that Decedent expressed an intention to revoke his testament, or that he treated any bequest in his testament as revoked.

A lack of evidence in the record that the Decedent intended to revoke his will is evidence that he did not intend to revoke it. Unlike the clear evidence of a testator tearing up his will and stating he wishes it revoked, it is unlikely that a testator who has no intention of revoking his will is going to randomly pronounce to anyone who will listen that he has no intention to revoke it. *Succession of Middlebrooks*, 23-236, p. 15 (La. App. 3 Cir. 2/27/24), 381 So.3d 298, 307.

For the foregoing reasons, I would reverse the ruling of the trial court and remand to trial court to probate the signed and notarized copy of the Decedent's notarial testament.