530 So.2d 1132 (1988)
SUCCESSION OF Robert Mirkil TALBOT.
No. 88-C-0296.
Supreme Court of Louisiana.
September 12, 1988.
Rehearing Denied October 20, 1988.
Sidney Blitzer, Jr., Richard Zimmerman, Jr., Kantrow, Spaht, Weaver & Blitzer, A.P.L.C., Baton Rouge, for applicant.
Eugene Groves, Taylor, Porter, Brooks & Phillips, Baton Rouge, for respondent.
DENNIS, Justice.
The question presented is whether a testator's intentional destruction of one of the multiple originals of his will creates a presumption that he intended to revoke all of the other copies of the testament, and, if so, whether in the present case the presumption was rebutted by evidence to the contrary. The widow of the testator opposed the petition to probate the will filed by the contingent beneficiary under the will. After a hearing the trial court concluded that the will had been revoked, but the court of appeal reversed. 516 So.2d 431 (La.App. 1st Cir.1987) We reverse the court of appeal decision and reinstate the trial court judgment. A testator's intentional destruction of his will gives rise to a rebuttable presumption that he intended to revoke his testament and all copies thereof. Thus each copy of the will is revoked unless the presumption is overcome by sufficient proof establishing the lack of an intention to destroy or to revoke. In the present case, in which the testator died suddenly and unexpectedly about twelve hours after he, in his attorney's presence, had expressed his intention to revoke his will and had destroyed a multiple original of it, the presumption of revocation by destruction was not rebutted by evidence that an undamaged original copy of the will was found in a safe at the testator's condominium.

FACTS
Robert Mirkil Talbot, the testator in this case, was married twice. In 1981 during his first marriage to Miriam Talbot, he executed a will in multiple originals which bequeathed his entire estate to Miriam, or, if she should predecease him, to his friend *1133 J. Barker Kilgore as contingent legatee. Miriam Talbot died in 1983.
After his first wife's death, Robert Talbot moved into a small condominium on Wooddale Boulevard in Baton Rouge. After dating Lois McClen Mills for several months, Robert Talbot married her in November, 1984. The couple moved into Lois's apartment, but soon decided to purchase a new home on East Sheraton Boulevard. Neither of the Talbots' separately owned residences had been sold prior to purchase of the East Sheraton residence. This fact, coupled with the reality that their other wealth was also separate property, prompted the Talbots to consider the formulation of reciprocal wills.
Lois Talbot, who did not have a will at the time, knew that under the laws of intestacy her entire separate estate would go to her descendants. Mrs. Talbot, was concerned that, in the event of her death, Mr. Talbot might be unable to maintain the payments on the community mortgage from his income and property alone. On the other hand, the Talbots determined by consulting a Louisiana intestacy chart that, if Robert Talbot died intestate, Lois would receive Robert's entire estate under the laws of intestacy, as he had neither descendants, nor surviving parents or siblings. These concerns and their understanding of the law prompted them to consult the attorney who had prepared Mr. Talbot's 1981 will about drafting a will for their current situation.
The attorney advised them that it was necessary for Lois to make out a will if Mr. Talbot was to receive any of her separate property. Accordingly, the attorney was instructed to draft a testament in which Mr. Talbot was left $20,000 in cash, and the usufruct of the East Sheraton home. In addition, the will provided that Lois' townhouse was to be sold as soon as practicable after her death, with the net sale proceeds to be applied to the balance of the community indebtedness.
Mr. Talbot asked the attorney if a will was necessary in his case. The attorney advised Mr. Talbot to execute a reciprocal will. Nevertheless, he also advised Mr. Talbot that his entire estate would go to Lois, if he died intestate. The attorney assumed that Mr. Talbot's 1981 will had been voided by his first wife's death, although he had not recently checked the provisions of that will. Based upon his false impression that his wife would inherit his entire estate under the law of intestacy, Mr. Talbot rejected the attorney's advice to make a new will in order to save the $75 fee the new will would cost.
Some time prior to a later meeting with the Talbots, the attorney reviewed the duplicate original 1981 will which had been retained in his files. He discovered that although Mr. Talbot's late wife was the primary beneficiary of the will, a contingent beneficiary in the person of J. Barker Killgore had been created.
Upon the Talbots arrival at the attorney's office for the execution of Mrs. Talbot's will, the lawyer discretely steered Mr. Talbot to one side of the conference room to discuss the matter of the previous will. Speaking softly so as not to be heard by Mrs. Talbot, the attorney informed Mr. Talbot of the content of his 1981 will, showing him the attorney's office copy, and asked him if he wanted his present wife, Lois, to inherit his separate property, rather than Mr. Kilgore.
Mr. Talbot said "yes" and "seemed surprised" by either the existence or the content of the 1981 multiple original will. The attorney told Mr. Talbot that if he wanted to leave everything to his wife he had to destroy that will. Mr. Talbot said he would destroy the will, and before he left the attorney's conference room he tore the will in two in the attorney's presence. Before Mr. Talbot left, the attorney reminded him that there was another multiple original copy of the will in Mr. Talbot's possession. The lawyer testified that he made certain that Mr. Talbot understood that he should destroy that will and that he intended to do so. The lawyer did not discuss with Mr. Talbot what the consequences would be if he failed to "take care of" the other copy.
After the execution of Mrs. Talbot's will, the Talbots left the attorney's office at around 11:00 a.m., and went to a local truck *1134 sale to search for furnishings for their new home. After the sale, they went to lunch, and then on to K-Mart to purchase a set of lawn sprinklers for their East Sheraton home. Upon returning to the East Sheraton home at about 2:30 p.m. to unload the sprinklers, Mr. Talbot began to feel a pain in his chest. Sitting down for a while at the kitchen table, he took some medicine for what he believed to be indigestion. Mrs. Talbot testified that the Talbots remained at the East Sheraton residence until 5 p.m., at which point Mr. Talbot began to feel somewhat better, allowing them to return to their existing residence in Lois' townhouse. Around 9 p.m., Mr. Talbot became extremely short of breath, and was taken to the Medical Center for treatment. He died at 10:25 that evening.
Mrs. Talbot could not recall visiting Mr. Talbot's former residence at any time after leaving the lawyer's office on July 12, 1985. She only recalled visiting the condominium earlier in the week to move some of Mr. Talbot's things to the East Sheraton residence. Two residents of Mr. Talbot's former complex, Nellie Prestridge and Annette Morris, testified that they saw Mr. and Mrs. Talbot carrying boxes out of the condominium on the afternoon of Friday, July 12, 1985.
On the Saturday after Mr. Talbot's death, Barker Killgore accompanied Mrs. Talbot to Mr. Talbot's condominium to look up the name of Mr. Talbot's mother and father. Opening the safe, the two parties went through several papers before finding the information they needed. Mr. Killgore, who was aware of the 1981 will, and his status as a contingent beneficiary, was unable to find the will in this initial search of the condominium. Not to be denied, he returned, on two separate occasions to the residence, to search for the will, each time without Mrs. Talbot's knowledge or consent. On his third search, he was finally able to locate the 1981 will. He removed the will and employed an attorney to probate the instrument.
Mrs. Talbot filed an opposition to probate. After a trial on the merits, the trial judge declared the testament of 1981 to have been tacitly revoked. In his finding of facts, the trial judge found "beyond a shadow of a doubt" that decedent desired that all of his possessions be inherited by his widow, Lois Talbot. He also found that the physical destruction of his testament by Mr. Talbot in the presence of his attorney was done with specific intent to revoke the will.
Mr. Killgore appealed. The court of appeal reversed. 516 So.2d 431 (La.App. 1st Cir.1987). Acknowledging the correctness of the trial court's findings of fact, it nonetheless determined that decedent did not succeed in revoking his will because he did not destroy all of the copies. This court granted certiorari.

PRECEPTS OF LAW
The Civil Code provides that a will may be revoked by act of the testator either expressly (in which event the revocation must be in one of the forms prescribed for testaments, and clothed with the same formalities) or tacitly, resulting from some other disposition of the testator (as indicated by the subsequent incompatible testamentary dispositions, or the sale or donation inter vivos of the subject of the legacy), or some other act which supposes a change of will. La.Civil Code arts. 1691-95. In re Succession of Nunley, 224 La. 251, 69 So.2d 33, 34-35 (1954).
Although the Code does not specify that the destruction of a testament constitutes a revocation thereof, the fact of intentional destruction by the testator as constituting the most effective method of invalidation has been recognized by this court on many occasions. Jones v. Mason, 234 La. 116, 99 So.2d 46 (1958); Smith v. Shaw, 221 La. 896, 60 So.2d 865 (1952); Succession of Dambly, 191 La. 500, 186 So. 7 (1938); Succession of Tallieu, 180 La. 257, 156 So. 345 (1934); Succession of Batchelor, 48 La.Ann. 278, 19 So. 283 (1896); Succession of Hill, 47 La.Ann. 329, 16 So. 819 (1895); Succession of Blakemore, 43 La.Ann. 845, 9 So. 496 (1891); Succession of Muh, 35 La.Ann. 394 (1883).
Further, this court has adopted the uniformly adhered to rule that the failure *1135 to find a will which was duly executed and in the possession of, or readily accessible to, the testator, gives rise to a legal presumption of revocation by destruction; however, this presumption is a rebuttable one and so may be overcome by sufficient evidence. In re Succession of Nunley, 224 La. 251, 69 So.2d 33 (1954). See Fuentes v. Gaines, 25 La.Ann. 85, 102 (1873), rev. on other grounds, 92 U.S. 10, 23 L.Ed 524 (1876); cf. Succession of O'Brien, 168 La. 303, 121 So. 874, 875 (1929); see also Aubry et Rau, Droit Civil Francais Vol. 11 § 725 p. 509-510 (6th ed), (La.St.L.Inst. trans. 1969); Patrick v. Bedrick, 169 Conn. 125, 362 A.2d 987 (1975); Matter of Modde's Estate, 323 N.W.2d 895 (S.D., 1982); Garrett v. Butler, 229 Ark. 653, 317 S.W.2d 283 (1958); Harris v. Harris, 216 Va. 716, 222 S.E.2d 543 (1976); In re Murray's Estate, 404 Pa. 120, 171 A.2d 171 (1961); Duvergee v. Sprauve, 413 F.2d 120 (3d Cir.1969); In re Montgomery's Will, 121 Vt. 344, 162 A.2d 344 (1960); In re Salter's Estate, 209 Or. 536, 307 P.2d 515 (1957); Lovell v. Lovell, 272 Ala. 409, 132 So.2d 382 (1961); In re Kanera's Estate, 334 Mich. 461, 54 N.W.2d 718 (1952).
Moreover, in Jones v. Mason, 234 La. 116, 99 So.2d 46 (1958) this court applied that presumption of revocation in a case in which a testator executed his will in multiple copies, one original and several carbon copies. After the testator's death, the original was missing and only two of the carbon copies were found. This court recognized that these facts gave rise to a presumption of destruction and revocation but ultimately concluded that the presumption was a weak one which had been overcome by the testator's preservation of one of the duplicate originals of his will in his possession. Accord: In re McGuigan's Will, 10 Misc.2d 865, 171 N.Y.S.2d 151 (1957); Re Blackstone's Estate, 172 Misc. 479, 15 N.Y. S.2d 597 (1939); cf. Phinizee v. Alexander, 210 Miss. 196, 49 So.2d 250 (1950) (presumption overcome); Note, Loss of One of Two Duplicates in Possession of Testator, 35 Harv.L.Rev. 626 (1922).
The legal question raised in the present case is whether a presumption of revocation arises from the intentional destruction of one multiple original of a will, as well as from a failure to find one after the testator's death. We conclude that such a presumption should be adopted because of the probabilities of the situation and because a failure to do so would be inconsistent with our recognition of a similar presumption based on the failure to find a will subsequent to the testator's death.
A presumption shifts the burden of producing evidence and, under the preferable view, serves to assign the burden of persuasion as well. Therefore, the reasons for creating particular presumptions are similar to the considerations that bear upon the initial or tentative assignment of those burdens. McCormick, Evidence § 343 (3rd ed. 1984).
One frequently significant consideration in the fixing of the burdens of proof is the judicial estimate of the probabilities of the situation: the risk of failure of proof is often placed upon the party who contends that the more unusual event has occurred. Id. § 337. In the present case, we conclude that this consideration is predominant and that the proponent of the will should bear the burden of proving that a testator, who intentionally destroyed a copy of his will under circumstances consistent with his having an aim to revoke, either did not in fact intentionally authorize or commit the destructive act or else did not do so with an intention to revoke. The presumption may be weak or strong, and more or less easily rebuttable, depending on the clarity of the evidence as to whether the testator was the author of the will's destruction, whether he expressed an intention to revoke the will, whether he had access to other originals of the will prior to his death, whether he treated any extent copy of the will as not having been revoked, and as to any other issue bearing upon the testator's intention with respect to the destruction and revocation of the will.
If the mere absence of a multiple original of a will after the testator's death tends to increase the probability of its destruction by him so as to justify a presumption of his *1136 revocation of the testament by destruction, certainly proof that the testator in fact destroyed his will before his death ought to give rise to a similar presumption. Furthermore, when the testator, in the presence of a credible witness, declares his intention to revoke his will and in fact destroys an original thereof, as in the present case, the presumption should not be rebuttable except upon clear proof of a contrary contention.
Among Anglo-American jurisdictions which have confronted the issue, it is the general rule that the intentional destruction or cancellation by the testator of the copy of his duplicate will retained in his possession raises the presumption of an intention to revoke all copies and the whole will, in the absence of proof to the contrary. See King v. Bennett, 215 Ga. 345, 110 S.E.2d 772, 776 (1959); In re Holmberg's Estate, 400 Ill. 366, 81 N.E.2d 188, 190 (1948); In re Janes's Estate, 18 Cal.2d 512, 116 P.2d 438, 442 (1941); In re Estate of Tong, 619 P.2d 91, 92 (Colo.App.Div. I 1980). Annot., 17 A.L.R.2d 805, 813 (1951).
According to Aubry and Rau, however, a different view prevailed in France in the 1800's. Aubry et Rau, Droit Civil Francais Vol. 11 § 725 pp. 508-510 (6th ed), (La.St.L. Inst. trans. 1969). The destruction, laceration or cancellation of an olographic testament made knowingly and intentionally by the testator himself, imported the revocation of the testament when there was only one original. Id., p. 508. However, relying on nineteenth century jurists and commentators, Aubry and Rau reported that the testator was not, as a general rule, presumed to have intended the revocation of his disposition unless he had destroyed, lacerated or cancelled all the originals of his testament; the fact that he had destroyed, lacerated or cancelled one of them only would not constitute proof of his intention to revoke his testament in this manner. Id., pp. 508-509.
Nevertheless, we are persuaded by our own judicial estimate of the probabilities of the situation to recognize the presumption of revocation by destruction in cases involving multiple original wills. Aubry and Rau do not give the reasoning of the nineteenth century jurists and commentators for not recognizing the presumption in such cases, but it may have been their opinion that the practices and circumstances of that time in France made a testator's failure to destroy all originals of his will probably incompatible with an intention to revoke. In modern Louisiana practice and usage, however, the ease and frequency with which attorneys have clients execute multiple originals both increases the chances of lost or forgotten wills and diminishes the significance of a testator's failure to destroy each original in revoking his will. Furthermore, we are unable to assess the quality of the jurisprudence summarized by Aubry and Rau or to determine whether it was modified subsequent to the 1800's because the texts and translations of the underlying authorities are not readily available and there appears to be no other French commentary on the subject. Finally, since the commentary by Aubry and Rau related merely to the failure of the jurisprudence to recognize the presumption in nineteenth century multiple original will cases, their view in this respect is less influential than it might have been if it had pertained to codal interpretation or methodology or to more modern jurisprudential developments.

APPLICATION OF LAW TO THE FACTS
Because the evidence presented by Mrs. Talbot established that the testator declared his intention to revoke his will and contemporaneously destroyed an original thereof, a presumption arose shifting to the proponent of the will the burdens of producing evidence and persuading the trial court of contrary essential facts. The trial court found, apparently even without the aid of a presumption, that the will had been revoked because the testator had destroyed the original with the specific intent of revoking it. The evidence fully supports the trial court's findings and necessarily leads to the conclusion that the proponent failed to rebut the presumption of revocation.
Mr. Kilgore, the proponent of the will, sought to prove that the testator acted and *1137 spoke inconsistently with his true intention when he destroyed the original of the will in his lawyer's office. The proponent relied mainly on the testimony of two neighbors who said Mr. and Mrs. Talbot visited the condominium the day he died and Mr. Kilgore's own testimony that he discovered an undamaged original of the testator's will there after Mr. Talbot's death. This evidence is insufficient, however, to persuade a reasonable trier of fact of the highly unusual events posited by Mr. Kilgore's theory of the case, viz., that the testator intended to leave his entire estate to Mr. Kilgore under an unrevoked will at his condominium, that the testator tore up his will with a revocatory statement merely to deceive his lawyer, that the testator misled his wife into bequeathing property to him because she believed that she reciprocally stood to inherit his entire estate, and that the testator purposefully refrained from destroying the other original copy of the will in order to leave everything to Mr. Killgore.
The proponent's evidence is weakened considerably by the testimony of Mrs. Talbot who said that she and her husband did not visit the testator's condominium after leaving the lawyer's office. Even if the Talbots visited the condominium after leaving the lawyer's office, Mr. Talbot's failure to destroy the original of the will located there does not have much tendency, if any, to show that he earlier had employed subterfuges to deceive his wife and his lawyer. There are other more plausible explanations of his failure to destroy the will at the condominium. There was no evidence that he knew his end was near at the time the neighbors said he visited the condominium; he did not become ill until later in the day at another location. While at the condominium he simply could have forgotten about destroying the will or decided to put off the chore until another time. He could have misunderstood his lawyer's advice and thought he had already revoked the will. It is possible that he was unable to find the will readily among his papers and belongings and intended to return for a more thorough search later. Moreover, there is no actual evidence, as opposed to speculations, that Mr. Talbot intended to deprive his wife of her inheritance or to deceive her and his own attorney. Instead, the evidence as a whole, overwhelmingly supports the trial court's findings that Mr. Talbot intended to revoke his will and to leave his entire estate to his wife under the laws of intestacy.
The judgment of the court of appeal is reversed and the judgment of the trial court is reinstated.
REVERSED; TRIAL COURT JUDGMENT REINSTATED.
LEMMON, J., concurs and assigns reasons.
COLE, J., concurs, rejecting the premise that a presumption of revocation should arise from the testator's intentional destruction of one multiple original of his will.
LEMMON, Justice, concurring.
This case should be decided on the basis that the overall evidence, both direct and circumstantial, preponderates in favor of the conclusion that the testator tacitly revoked his will under La.C.C. art. 1691, rather than on the basis that his intentional destruction of one duplicate original of his will created a rebuttal presumption of his intent to revoke the other duplicate original.
The opponent to the probate of the remaining duplicate original had the burden of proving the testator's intent to revoke his will by a preponderance of the evidence. Intent, being a state of mind, generally must be proved by circumstantial evidence. The testator's act of destroying one duplicate original was direct evidence of his intent to revoke that copy, as well as circumstantial evidence which raised an inference of his intent to revoke all copies. Other evidence was introduced by both sides bearing of the ultimate question of the testator's intent for tacit revocation. At the conclusion of the case, the judge's task was to weigh the evidence to determine the preponderance on the ultimate question, unaided by a presumption. The overall evidence *1138 preponderated in favor of tacit revocation.