MAX N. TOBIAS, JR., Judge.
_JjThe petitioner, Diana Dalier Janet (“Diana” or “the appellant”), filed suit seeking to annul the probated copy of the “Last Will and Testament” of her father, John C. Dalier (“the decedent”), on the basis that the decedent had destroyed the original testament with the intent of revoking it. The trial court held that the copy of the will presented for probate was valid and that the original was presumptively destroyed in Hurricane Katrina with no intention of revocation by the decedent. The trial court entered judgment against Diana dismissing her claims. For the reasons that follow, we affirm.
On 8 May 2009, Deborah Dalier Gex (“Deborah”) and John C. Dalier, Jr. (“John Jr.”) (collectively, “the appellees”), both children of the decedent, filed a petition to probate a copy (not the original) of the testament of their father, the decedent, and for the appointment of an independent executrix.[1] Attached to the petition was a copy of the decedent’s Last Will and Testament, in notarial form, dated 12 December 2004, and a lost will affidavit executed by attorney-at-law and notary public, Marilyn G. Pepper (“Ms. Pepper”), who had prepared and notarized the original testament. In his will, the decedent provided for payment of certain |2debts and bequeathed the remainder of his entire estate jointly to the appellees. The will is devoid of any reference to the decedent’s daughter, Diana.[2] The copy of the dece *10 dent’s will was admitted to probate by order of the court dated 8 May 2009. By order of that same date, the court confirmed the appointment of Deborah as the independent executrix.
Diana filed a petition to annul the probated copy of her father’s testament on 2 June 2008. An answer to the petition was filed by the appellees on 30 June 2008. A trial was held on 1 August 2008. On 15 October 2008, judgment was rendered in favor of the appellees and against Diana, dismissing the petition for annulment.
Diana timely appealed assigning three errors: the trial court (1) failed to apply the correct legal presumption that arises when a will is lost or destroyed; (2) misinterpreted the trial testimony of a witness on a crucial point; and (3) erroneously concluded that the decedent’s will was ac-cidently destroyed with no intent of revocation. The first and third assignments of error are interrelated; we discuss them together. A discussion of the second assignment of error follows.
In an action to annul a notarial testament, the party seeking to annul the will bears the burden of proving the invalidity of the testament. La. C.C.P. art. 2932 B. However, when the original of a will cannot be found after the testator’s death, a presumption arises that the testator destroyed the will with the intention of revoking it.[3] Succession of Hatchell, 03-0163, p. 3 (La.App. 1 Cir. 11/7/03), 868 So.2d 36, 38; Succession of Talbot, 530 So.2d 1132, 1134-35 (La.1988). The burden then shifts to the proponents of the will to rebut the presumption and to establish that the testator did not intend to and/or did not revoke the will by destroying it. See Succession of Talbot, 530 So.2d at 1135.
The presumption applied to lost or destroyed wills “may” be rebutted by “clear proof’ (1) that the testator made a valid will; (2) of the contents or substan-tiality of the will; and (3) that the will was not revoked by the testator. Id., 530 So.2d at 1134-35. See also In Re Succession of Claiborne, 99-2415, p. 3 (La.App. 1 Cir. 11/3/00), 769 So.2d 1267, 1268, citing Succession of Nunley, 224 La. 251, 69 So.2d 33, 35 (1953). In discussing the presumption, the Court in Succession of Talbot stated:
The presumption may be weak or strong, and more or less easily rebutta-ble, depending on the clarity of the evidence as to whether the testator was the author of the will’s destruction, whether he expressed an intention to revoke the will, whether he had access to other originals of the will prior to his death, whether he treated any extant copy of the will as not having been revoked, and as to any other issue bearing upon the testator’s intention with respect to destruction and revocation of the will.
See also Succession of Altazan, 96-0409, p. 4 (La.App. 1 Cir. 11/8/96), 682 So.2d 1320, 1322.
*11 Thus, Louisiana jurisprudence has created a variable scale of the requisite proof necessary to refute the presumption, depending upon the weakness or strength of the evidence surrounding the lost or destroyed original. Id.; see also In Re Succession of Claiborne, 99-2415, p. 4, 769 So.2d at 1269. Moreover, clear and convincing proof that a person other than the testator destroyed the will without the direction, consent, or permission of the testator would be sufficient to overcome the presumption that the testator revoked the will by destroying it. Succession of Doucet, 42,963, p. 7 (La.App. 2 Cir. 2/6/08), 975 So.2d 738, 741; Succession of Bagwell, 415 So.2d 238, 240 (La.App. 2nd Cir.1982).
In the case at bar, the first two requirements for rebutting the presumption of intentional revocation are met and largely undisputed. We find that the notarial will of 12 December 2004 and its contents were proven through the testimony of Ms. Pepper, the decedent’s attorney, who prepared and notarized it. Ms. Pepper testified that she was retained by the decedent and on 12 December 2004 at his direction, prepared and the decedent executed his Last Will and Testament in notarial form. Ms. Pepper stated that the decedent was given the original of his will and she retained a copy. At trial, Ms. Pepper verified that the copy of the decedent’s will contained in the trial court record was an accurate copy of the executed will of 12 December 2004.
As to the third requirement of Succession of Talbot — whether the decedent revoked his will — we find no evidence in the record establishing that the decedent’s will was ever intentionally revoked by him or any other person. To the contrary, evidence is abundant showing the decedent was adamant that he wanted only Deborah and John Jr. and not the appellant to inherit from him in order to rectify the inequities the decedent believed to have been created previously by his brother’s succession.[4]
IsAccording to Ms. Pepper, the decedent advised her of his specific intentions not to bequeath anything to Diana due to a dispute between the two regarding property she had previously inherited from the decedent’s brother, Bertrand Dalier. According to Ms. Pepper, the decedent remained upset about his brother’s succession even after Hurricane Katrina, and it was his continuous desire through the making of his own will to rectify the disparity caused by the unequal distribution of assets among his three children in his brother’s will.
Ms. Pepper testified that, at the time the decedent executed the will, she advised him that he could revoke the will by destroying it whereby his estate would thereafter be divided equally among his three children in the event he died intestate. Ms. Pepper stated that she represented the decedent for at least one year prior to the death of his brother and considered herself to be the decedent’s attorney. The decedent never indicated to her that he had retained another attorney to prepare a separate or subsequent will on his behalf or to perform any other legal work for him, nor did he ever indicate to her any desire to change the provisions of the 12 December 2004 testament. Ms. Pepper also testified that she did not believe the decedent ever revoked the will he executed in December of 2004.
Deborah, executrix of decedent’s will, testified that prior to Hurricane Katrina *12 she visited her father on a daily basis. She was not only aware of the 12 December 2004 testament, but had the opportunity to see it on occasion in various locations in his home prior to the hurricane. Deborah was aware that the will, after the payment of certain debts, divided her father’s property equally between John Jr. and herself, and that Diana was not referenced in the will at all. It was | ^Deborah’s understanding from speaking with her father that his reason for leaving Diana out of his will was to “try and even things out for his children” following Diana’s receipt of a substantially larger portion of his late brother’s estate. According to Deborah, her father did not have a safety deposit box in which he could keep his will or other documents, so he would often move the documents, including the will, from one place in his house to another. Deborah could not recall the last place she saw the will prior to Hurricane Katrina.
As Hurricane Katrina approached, the decedent was initially with Deborah as they prepared to evacuate. He had with him a small suitcase containing a few of his belongings. When it came time to actually evacuate, however, the decedent refused to leave, and Deborah brought him back to Chalmette where he stayed with John Jr. To her knowledge, the decedent did not have any personal belongings with him at that time. During the storm, the decedent’s home located at 2816 Dauterive Drive in Chalmette, was inundated with flood waters and debris from an oil spill, and other than a few documents that were salvaged by John Jr. several months thereafter, everything the decedent owned was destroyed. While Deborah had no independent knowledge that the decedent’s original will was actually destroyed as a result of the hurricane, given the total destruction of the home and John Jr.’s attempt to salvage whatever documents possible, she believed the 12 December 2004 testament was destroyed in the storm, and thus, requested and obtained a copy from Ms. Pepper.
Following the hurricane, the decedent was unable to return to his Chalmette home to live and was placed in an assisted living/ nursing home facility where Deborah visited him every weekend. During the 2.5 years thereafter, up to the time of his death, Deborah did not discuss with her father the will or its presumed ^destruction during the storm. At no time, however, did the decedent ever indicate to her that he had changed or intentionally destroyed his original will, or that he had ever reconciled with Diana.
According to the testimony of John Jr., the decedent stayed with him at his home in Chalmette on the night that Hurricane Katrina struck. At the time, his father had no personal papers or belongings with him. The decedent eventually had to be rescued. In the months following the storm, John Jr. returned to his father’s flooded home in Chalmette and, while he was not specifically looking for the will,[5] he searched for and “grabbed documents, paperwork that were legible ... that [he] could find;” anything he came across that was salvageable, he salvaged. Though John Jr. was able to recover some valuable documents, e.g., savings bonds and birth records, the decedent’s original will was not among the documents he salvaged before the home, including its contents, was eventually torn down.
Further, once the decedent was moved into the assisted living' nursing home facil *13 ity a month after the hurricane, John Jr. testified that he was only able to see him one or two weekends per month. At no time did the decedent ever indicate to him that he destroyed or intended to revoke his will.
The testimony of Diana is particularly compelling. Diana avers that at some time subsequent to executing his will, her father physically destroyed it and thereby revoked it. She contends it is “reasonable to believe that subsequent to executing the 12 December 2004 will, the decedent, declining in his physical health, realized that he had been unfair in his reasoning and destroyed the will knowing from Ms. Pepper’s advice that in doing so, his estate would be shared | «equally by his three children.” However, Diana’s own testimony disputes this contention:
A. He told me that I came to see him to get money.
Q. And what did you interpret that to mean?
A. Since I have never ever borrowed money from him, I interpreted it to mean after he passed away.
Q. And did he tell you or indicate to you that he was not leaving you any money after he passed away?
A. He said I was not getting any money-
Q. When you went to see him in August of '06, do you believe at that time he had gotten over his anger with you over your uncle’s succession?
A. No, because he did — he started to tell me about the succession, about my grandmother, so he was sort of still rambling on about the succession. He didn’t appear to be as upset.
Q. Do you think he revoked the will before then?
A. I have no idea.
According to the appellant’s testimony, she saw her father in August 2006, almost an entire year after Hurricane Katrina destroyed his home, which is where the original of his will was last seen; at that time, the decedent verbally expressed his intentions not to leave her any property in his will.
We are of the opinion that had the decedent intentionally revoked his will as espoused by Diana, why would he tell her one year after it was supposedly destroyed that he still did not want her to have anything of his when he died. We find the evidence compelling that the decedent did not intend to revoke his will as no evidence exists suggesting any indication that he chose any other manner to distribute his estate other than as provided in his 12 December 2004 testament.
l9To the extent the trial court placed the burden upon the appellant to prove the invalidity of the copy of the decedent’s will when it dismissed her petition to annul, we find the trial court should have applied the legal presumption that the decedent destroyed the will with the intention of revoking it. However, we find the error harmless for our review of the record as a whole establishes that the outcome of this case is the same even when the presumption is properly applied to the facts before us.
In her second assignment of error, the appellant contends the trial court misinterpreted certain testimony given by Ms. Pepper on a crucial point affecting the outcome of this case. We disagree. Diana refers to an alleged erroneous conclusion reached by the court that Ms. Pepper had instructed the decedent to inform her if he intended to revoke his will so that she could return the copy of the will she maintained to him for destruction likewise as the original.[6] Specifically, the appellant *14 provides only a portion of an exchange that took place between the court and Ms. Pepper on this point; the entire exchange reads:
THE COURT: Ms. Pepper, I have done a lot of these things in my practice. You told him — did you tell him you were going to keep a copy of the will?
THE WITNESS: Yes.
THE COURT: So he knew you had it? THE WITNESS: Yes.
THE COURT: Did you also give him any advise [sic], if he chose to destroy his original, he should call you or anything like that?
|inTHE WITNESS: I am sure that I did. That would be the normal thing to do.
[[Image here]]
THE COURT: What did you tell him about destruction of the Will, revocation by destruction?
THE WITNESS: I cannot swear on this stand that I told him he could tear it up. I may have.,
THE COURT: Did you give him any further instructions, like if you destroy it, should you do anything, I have a copy of it?
THE WITNESS: No, I don’t remember telling anything him that.
THE COURT: My practice was, if you destroy it, you give me a call, because I have a copy of it. That was not the case here? Or you don’t remember if that was the case? If you don’t remember, that is fine.
Based on our reading of the entirety of Ms. Pepper’s testimony, we find that it supports the trial court’s conclusion that the decedent was aware that if he intended to revoke his will, he should contact Ms. Pepper. We find it of no consequence whether or not the decedent knew to contact Ms. Pepper in order that she could return her copy of the will to him because the whole of the evidence simply does not support a conclusion that the decedent ever intended to revoke his original will.
After thorough review, we do not find the trial court erred in dismissing the appellant’s petition to annul the copy of the probated testament. The overwhelming evidence in this case clearly and convincingly establishes that the decedent did not destroy his will with the intention to revoke it, but rather, the original will was destroyed along with the majority of the decedent’s other possessions in Hurricane Katrina. Even though the exact circumstances of how the decedent’s will came to be lost or destroyed are unknown, we further find the Inevidence clear and convincing that the decedent did not revoke his will with the intention of having the appellant inherit from his estate. For these reasons, we find no error in the trial court’s decision to admit to probate the copy of the decedent’s 12 December 2004 will and dismissing the claims of the appellant.
Accordingly, the judgment of the trial court is affirmed.

AFFIRMED.

. La. C.C.P. arts. 3396, et seq.

. The decedent died on 17 January 2008. He was married but once and then to Vita Torto-rich Dalier, who predeceased him on 4 June 1997. Three children were bom of their marriage, namely, Diana, Deborah, and John Jr., *10 all of whom survived him and were over the age of twenty-three at the time of his death. The decedent had no other children.

. La. C.C. art. 1606 provides that a testator make revoke his testament at any time. Methods of revocation are provided for in La. C.C. art. 1607:
Revocation of an entire testament occurs when the testator does any of the following:
(1) Physically destroys the testament, or has it destroyed at his direction.
(2) So declares in one of the forms prescribed for testaments or in an authentic act.
(3) Identifies and clearly revokes the testament by a writing that is entirely written and signed by the testator in his own handwriting.

. The decedent’s brother, Bertrand Dalier, named Diana the co-executrix of his will and left the majority of his estate to her, bequeathing significantly smaller portions to the appel-lees. The record supports the conclusion that the unequal treatment of his children resulting from his brother’s succession was very upsetting to the decedent.

. The testimony indicates that John Jr. was not aware that his father had even prepared a will until after his father's death.

. In its reasons for judgment, the trial court stated the following regarding Ms. Pepper’s testimony:
*14 She further stated she advised Mr. Dalier at the execution of the will, she advised him that a will could be revoked by destruction and if that would be his intention at any time in the future, he should advise her so that a duplicate copy of the will kept by her could be returned to him for destruction likewise as the original.