# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 23-236

**SUCCESSION OF**

**CHARLES RAY MIDDLEBROOKS, JR.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2021-904509-B
HONORABLE WILLIAM BENNETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and Guy E. Bradberry, Judges.

**AFFIRMED.**

**Benjamin A. Luke**
**Leanne M. Broussard**
**Benjamin A. Luke Attorney at Law, LLC**
**2004 Jackson Street**
**Alexandria, LA 71301**
**(318) 487-5944**
**COUNSEL FOR OTHER APPELLANT:**
     **Chance Middlebrooks, Executor**

**Matthew L. Nowlin**
**Keiser Law Firm, P.L.C.**
**Post Office Box 12358**
**Alexandria, LA 71315**
**(318) 443-6168**
**COUNSEL FOR OTHER APPELLEE:**
     **Rosalind Middlebrooks Juneau**

**GREMILLION, Judge.**

Appellant, Chance Middlebrooks,[1] the independent executor for Charles Ray Middlebrooks, Jr., appeals the trial court's judgment that probated a will in the Succession of Charles Ray Middlebrooks, Sr., through its Independent Executrix, Rosalind Middlebrooks Juneau, the Appellee. For the following reasons, we affirm.

## FACUTAL AND PROCEDURAL BACKGROUND

Charles Ray Middlebrooks, Sr. died on May 31, 2021. Appellee filed a petition for appointment of notary public to search for last will and testament, for order of effect of probate, and for confirmation of independent executrix on November 15, 2021. The petition sought to probate a September 28, 2017 last will and testament executed by Decedent that named her as the sole legatee of his estate to the exclusion of four living siblings. The petition noted, however, that Juneau searched Decedent's residence and could not find an original and that counsel failed to verify with Decedent's attorney whether the September 2017 will sought to be probated matched the copy of the last will and testament located in Decedent's file at his attorney's office.

On December 17, 2021, an affidavit from the court appointed notary verified that, after duly searching, the original last will and testament could not be located. On December 30, 2021, Appellee was confirmed as an Independent Administratrix of the succession.

On March 11, 2022, Appellant filed a petition to annul probated testament, request for an accounting, and request for injunctive relief. On May 6, 2022, Appellee filed a dilatory exception of improper cumulation of actions, peremptory

---

[1] Chance Middlebrooks is the grandson of the Decedent.

exception of no right of action, and peremptory exception of nonjoinder of a party. Appellant filed an opposition on July 8, 2022. On August 30, 2022, Appellee filed an answer to petition to annul probated testament. Identical judgments were entered into the record on October 10, 2022, and October 13, 2022, granting the Appellee's exception of no right of action, dismissing Appellant's request for an interim accounting by Appellee, and denying the exception of nonjoinder of a party.

Stipulated testimony of Charles Ray Middlebrooks, Jr. was submitted into the record on October 14, 2022, stating in pertinent part that he "believed that his father had a last will and testament, but never saw the will's contents;" "he does not know where the decedent kept the original will but believed it was under his father's pillow or mattress;" and, "The Petition to Annul Probated Testament is based solely on the legal presumption, and not on any knowledge that the decedent destroyed any will before his death."

Following a trial on October 14, 2022, the trial court rendered a judgment finding that Appellee "successfully rebutted any presumption that the decedent, Charles Middlebrooks, Sr., revoked by destruction his September 28, 2017 Last Will and Testament, which has heretofore in these proceedings been duly proven and ordered executed according to law[.]"

Appellant timely appealed.

## ASSIGNMENTS OF ERROR

1. The Trial Court committed legal error when it improperly interpreted and/or applied [*Succession of Talbot*, 530 So.2d 1132 (La.1988)] and other case law regarding the standard of rebutting the legal presumption that the will was revoked by the testator when the original cannot be found.

2. The Trial Court committed a manifest error in its finding that the presumption was rebutted.

2

3. The Trial Court committed legal error and/or manifest error when it upheld probation of a copy of a Last Will and Testament when no search of the home was performed.

## DISCUSSION

Louisiana Civil Code Article 1607 provides, in pertinent part, that a testator revokes his testament when he:

(1) Physically destroys the testament, or has it destroyed at his direction.

(2) So declares in one of the forms prescribed for testaments or in an authentic act.

(3) Identifies and clearly revokes the statement by a writing that is entirely written and signed by the testator in his own handwriting.

In *Succession of Nunley*, 224 La. 251, 256-57, 69 So.2d 33, 35 (1954) (emphasis added)(citations omitted), the supreme court stated:

> The fact that an olographic will, *shown to have been in the possession of or accessible to the deceased*, cannot be found at his death, gives rise to a legal presumption of revocation by destruction; however, this presumption is a rebuttable one . . .[.] The onus of rebutting this presumption is cast upon those seeking to establish the will, by clear proof (1) that the testator made a valid will, (2) proof of the contents or substance of the will, and (3) of the fact that the will, though it could not be found at the testator's death after diligent search, was never revoked by him.

In *Talbot*, 530 So.2d at 1134–35, the supreme court again noted "the uniformly adhered to rule" set forth in *Nunley* that a will in "possession of, or readily accessible to, the testator" that can no longer be found gives rise to the presumption of revocation. The court then thoroughly addressed the burden of proof when a presumption of revocation applies. The testator in *Talbot*, in the presence of his attorney, physically destroyed one of the multiple original copies of his will and declared his intent to revoke it although another of the multiple original copies of the will was found by a legatee at his residence. The court stated:

The legal question raised in the present case is whether a presumption of revocation arises from the intentional destruction of one multiple original of a will, as well as from a failure to find one after the testator's death. We conclude that such a presumption should be adopted because of the probabilities of the situation and because a failure to do so would be inconsistent with our recognition of a similar presumption based on the failure to find a will subsequent to the testator's death.

A presumption shifts the burden of producing evidence and, under the preferable view, serves to assign the burden of persuasion as well. Therefore, the reasons for creating particular presumptions are similar to the considerations that bear upon the initial or tentative assignment of those burdens. McCormick, Evidence § 343 (3rd ed. 1984).

One frequently significant consideration in the fixing of the burdens of proof is the judicial estimate of the probabilities of the situation: the risk of failure of proof is often placed upon the party who contends that the more unusual event has occurred. Id. § 337. In the present case, we conclude that this consideration is predominant and that the proponent of the will should bear the burden of proving that a testator, who intentionally destroyed a copy of his will under circumstances consistent with his having an aim to revoke, either did not in fact intentionally authorize or commit the destructive act or else did not do so with an intention to revoke. The presumption may be weak or strong, and more or less easily rebuttable, depending on the clarity of the evidence as to whether the testator was the author of the will's destruction, whether he expressed an intention to revoke the will, whether he had access to other originals of the will prior to his death, whether he treated any ext[a]nt copy of the will as not having been revoked, and as to any other issue bearing upon the testator's intention with respect to the destruction and revocation of the will.

If the mere absence of a multiple original of a will after the testator's death tends to increase the probability of its destruction by him so as to justify a presumption of his revocation of the testament by destruction, certainly proof that the testator in fact destroyed his will before his death ought to give rise to a similar presumption. Furthermore, when the testator, in the presence of a credible witness, declares his intention to revoke his will and in fact destroys an original thereof, as in the present case, the presumption should not be rebuttable except upon clear proof of a contrary contention.

*Id.* at 1135–36.

4

The court then applied the presumption of revocation and shifted the burden to the proponent of the will to produce facts sufficient to convince the trial court that the will had not been revoked. The supreme court concluded that the trial court did not err in finding that the testator intended to revoke his will.

### *Testimony*

Joanna Juneau, Appellee's daughter, testified that she visited her grandfather between four to six times per week until she and her mother stopped visiting in April 2021, because Roderic Middlebrooks, who lived there with his father, was very angry. Joanna testified that she had seen a copy of the will that was probated, and that her grandfather kept his will "under the bed, under his mattress between the box spring and his mattress, along with his other Will, the living will it's called." Joanna, who was twenty-eight years old at the time of trial, said she did not see her grandfather from the time she was about nine until she was about twenty years old. She further said that her mother also "wasn't allowed" to see her father during that time because Joanna's father was "very controlling and very mean." Once her mother and father divorced, they started to regularly visit her grandfather.

When asked why Roderic was angry with them, she stated it was because Roderic knew that Rosalind was bequeathed everything. Joanna said that her grandfather showed her the will one time in the two to three years prior to his death, but that he did not allow her to read it or hold it. Joanna testified that she noticed things missing when they would visit, such as a salt and pepper shaker set, so she started taking pictures of things. Joanna testified that her grandfather would often say that her mother "gets it all."

Margaret Middlebrooks Vidrine, Decedent's sister, testified that she lived across the street from her brother and visited him three times per week when Roderic

went to his dialysis appointments. Vidrine said that her brother was bedridden but could get up and walk a short distance until the last week or two before his death when he was unable to get out of the bed. However, she said his limitations were strictly physical, and he had full mental capacity right up until his death. Vidrine said she noticed a few things missing in the last couple of weeks before her brother died, such as pictures that had been hanging on the wall and "maybe a gun." Vidrine testified about a check Decedent received for the sale of cattle that was sitting on a chest of drawers. She inquired of her brother if he would like her to deposit it for him, but she testified that he said, "no, I want to divide that check between Roselyn [sic] and Rodrick [sic]." The date of this exchange was established from text messages on May 21, 2021. Vidrine further testified about a missing picture of her brother when he was a baby that had been on the wall.

According to her testimony, Vidrine never saw her brother's will, but he did talk to her about it. He never mentioned to her that he amended or revoked his will. Vidrine could not recall if Rosalind or Joanna attended her brother's funeral, admitting that she has "Alzheimer's and I can remember some things but not everything." Vidrine stated that she had been diagnosed with Alzheimer's for "about four or five years." She went on to state that her brother talked to her about his will "probably a couple of weeks before he passed" and that "he left everything to Roselyn [sic]." She was further questioned:

Q. He said that to you specifically?

A. I'm almost sure he did.

. . . .

Q. Has anyone else ever told you that that he was leaving everything to Roselyn [sic] other than your brother?

6

A. I'm not sure.

Q. I think what I'm asking is it possible that someone else told you that and not your brother?

A. I'm foggy as to if they did or not, you know.

Regarding the text messages that she sent to Rosalind about Decedent, Vidrine stated that she started taking care of him because Rosalind was not there anymore. She stated Roderic was never angry with her.

Rosalind testified that her brother lived in the family home with his father his entire life. Rosalind testified that she quit her job at the casino in 2020, to take care of her father. However, she did not live in her father's home. She said that in April 2021, her brother Roderic went on a nine-or-ten-day vacation and, during that time, she stayed overnight at the home with her father. Toward the end, Rosalind testified that she was afraid of Roderic so she only visited when he was at his dialysis appointments, before 10:00 a.m. on Monday, Wednesday, and Friday. Regarding her father's mobility, Rosalind testified:

Q. O.K. What was your dad's health condition in those final months before he passed away?

A. Final months going back how far?

A. Let's say two months before he passed away.

A. He was barely getting out the bed and after they sold the cattle then that's when it really hit him hard.

Q. And to the best of your memory when did …when were the cattle sold?

A. May-ish---May 20-ish, 21st.

Q. And your father passed away on May 31?

A. Yes, he did.

7

Rosalind said sometime between January and "April-ish" or May-ish" her father called her to come and retrieve his will from underneath his mattress, but that they could not find it. Roderic was not there at the time. Rosalind said the fact that the will was missing came as a surprise to her father. He also kept his living will under the mattress. However, both were missing. Rosalind testified that her father said, "he would take care of it," which meant talk to Roderic. She said this was the last time she and her father discussed the will and that he never told her he destroyed it. She said that after this event, "she didn't go back much after that." However, she talked to her father on the phone, and she said that he wished for the cattle check proceeds to be split evenly between her and Roderic. Rosalind said she never received her half. She testified that her father's safe had gone missing after her appointment as executrix and that Roderick filed a police report essentially accusing her of stealing it.

Rosalind stated that since her father's death, she has not searched his residence for his will, and to her knowledge, no one else had either. She said he always kept the will under his mattress, that the last time she saw it was in 2013, and in that will he left "all" to her, and that when she went to look for it again at his bequest it was no longer there. She also testified about missing salt and pepper shakers and missing guns.

Rosalind was asked how she obtained a copy of the will, and she stated that she removed the original from underneath the mattress in the home back in 2013 and brought it to her son's house to make a copy of it. She said that she had returned it and that was the last time she saw her father's will. She further stated that at the time when she went to look for it between January 2021 and her father's death in May 2021 at her father's request, he never discussed the will with her again.

8

However, the trial court questioned her:

Q. The Will that you make a copy of, is that the copy that you've had for this?

A. Yes, sir.

Q. When you said you made it in 2014 or 15 this one wasn't made until 2017, how did that happen? The Will that you've attached to the copy and your daddy allegedly signed September 28th, 2017?

A. I could have my dates mixed, you know.

Q. Did he ever make more than one Will, did he have a problem with …

A. He had one Jim said he only … I just heard an altercation you know my dad Rodrick [sic] had an altercation, him and dad got in an argument or something and they went up there and daddy changed the Will that went to him and Jim said he made that one.

Q. He had a Will that left everything to Rodrick [sic]?

A. Well no, I don't know what that Will even said.

Q. Do you know if he had any other Wills?

A. Not to my knowledge. Jim didn't have one at that time. He said he had the last one that dad did.

Later Rosalind testified:

Rodrick [sic] complained that daddy got mad at him one day and went and had Jim re-do it, went around the block and this is just a story I heard from Rodrick [sic]. That daddy got upset with him one day and he went and tore up a Will prior to that. And that this was the Will daddy said.

Roderic testified that he lived with his father for nearly sixty years before he moved out about six months after his father's death. Roderic stated he had been on dialysis for five years as of the time of trial. He said that his father was mentally sharp up until his death. Regarding the check for the cattle, Roderic testified that his father told him "to put it in the bank and he was going to pay me back if he didn't need it or he died." By pay him back, Roderic said "for the stuff that I had done for

9

him over the years and stayed with him and my brother and my mama." Roderic said he deposited the $60,000 cattle check into the bank, closed the account on June 29, 2021, and withdrew the money because he was the "payable on death" beneficiary of that account. Roderic denied taking anything from the house other than a table and a cedar robe out of his bedroom. He said that he had never seen his father's Will at any time. He said he never saw envelopes under his father's mattress and he and his father never talked about his will. Roderic said he did not take the guns, pictures, or salt and pepper shakers. He said his father never told him he tore up his will and he never saw him tear it up. Roderic testified that he did not know where the will was. Roderic said his father's estate did not owe him any money. He said he never looked for a will and he did not know what the contents of it were.

Roderic testified that in October 2021, he filed a police report with the Avoyelles Sherriff's Office because, upon returning from dialysis, the house had been broken into, stuff was scattered around, and his father's safe was gone. The safe is still missing and has never been recovered. He said his father told him there was money in the safe, but he did not know the combination to open the lock. He said only Rosalind knew the combination because on Thanksgiving Day in 2020,

> they got in the safe in November of 2020 and I told them daddy is going to find out that y'all got in there. And he asked me in January who got in his safe. And I told him that Roselyn [sic] and Joanna come [sic] looked in it. So he confronted her with it later and she says she just wanted to see if he had some money in there. You know, they did.

Roderic said his father asked Rosalind in front of Roderic if she had accessed the safe, and she admitted it. Roderic asked how much money was in the safe and there was $39,000 in it, none of which was missing after Rosalind and Joanna looked through it. Roderic then testified to some land of his that he donated to Rosalind in

July of 2018 because he nearly died; however, Rosalind donated it back to him in March 2021.[2] Roderic said he never threatened Rosalind or Joanna.

Roderic later testified:

Q. Did anybody ever tell you that your daddy left a Will leaving everything to Roselyn [sic]?

A. I heard that.

Q. When did you hear that the first time?

A. Whew…

Q. Before or after he died?

A. Before he died I guess.

Q. He told you that?

A. um hum.

Q. Did you know why he did that?

A. Well it was his doings.

Q. That's what he wanted?

A. That's what he wanted.

Q. Did he ever tell you he didn't want to do that anymore?

A. Well he did after she left and didn't take care of him and I had about six weeks there with him and he wasn't pleased.

Q. The last six weeks of his life?

A. Yes, sir.

Q. She didn't come around, why did she stop coming around?

A. I don't know.

Q. You don't know?

---

[2] Roderic subsequently donated the land to Rosalind's daughter and her husband.

A. Unt-unt.

Q. Wasn't because you and her got into it?

A. No.

Q. She just stopped?

A. She just stopped coming.

Q. How about your Aunt Margaret, did she keep coming?

A. She come [sic] and watch daddy while I went on dialysis days. Monday, Wednesday, Friday she'd come stay with him while I was on dialysis.

Q. Have you and Roselyn [sic] ever had cross words before?

A. No, the last words I had … heard her say she never did say too many but she told daddy and Aunt Margaret was standing right there, I come from dialysis and she said don't worry about me and Rodrick [sic] daddy I'm moving on and I might even move out of state. And she said I've got to go see a lawyer. And that the last words I heard her say. You know this was during those last six weeks. She would come periodically and see him.

Rosalind testified that things with Roderic got tense after Thanksgiving that she and her daughter opened the safe. She said she just wanted to see what was in there, but she did not take anything. She said there was money in envelopes, but they did not count it. She said Roderic was upset that they invaded the safe, but she apologized for it. She said she and Roderic had never had cross words until she and Joanna opened the safe.

### Trial Court's Reasoning for Ruling

Well first of all *Talbott* [sic] does not say that she has to prove that it was not revoked. What *Talbott* [sic] says is that the presumption can be weak or strong and more or less easily rebuttable depending on the clarity of the evidence as to whether the testator was the author of the Will destruction. There's absolutely not one shred of evidence to indicate that Mr. Charles Middlebrooks, Sr. destroyed his Will, nothing. Whether he expressed an intention to revoke the Will. We have absolutely no evidence that he had an intention to revoke the Will. Whether he had access to other originals of the Will prior to his death.

There's no evidence as to whether he had a copy, didn't have a copy, no generally he a [sic] copy, didn't have a copy, no evidence as to that. And no evidence as to any extent a copy of the Will as not having been revoked either. And I'm reading from *Talbott* [sic]. It's not saying that Ms. Juneau has to prove it was not revoked. There is a presumption, but that presumption can be overcome. In this case we have a will that was valid, there's proof of the substance in the Will. And the evidence indicated in this case which is similar [INAUDIBLE] charity in some parts I must say. I don't think we have the complete picture and I don't think everybody was completely honest.

But when we – other than Ms. Margaret yeah we've got to remember this lady is a sister of Charles, Sr., she's an aunt to Roselyn and an aunt to Charles, an aunt to Rodrick [sic]. And she testified so credible as to events that she witnessed herself. For example, that sixty some thousand dollar check. She said without question that her brother wanted it to be split between Roselyn [sic] and Rodrick [sic]. Mr. Rodrick [sic] says otherwise. There are even text messages about the check and this of that nature about it.

And we go further everybody who has testified and accordingly everybody in the family knew there was a rift. And then Ms. Juneau for some reason, we don't know why, still … I still don't know why. Mr. Middlebrooks wanted to leave everything to her. Nobody said he never wanted to leave everything to her. Everybody said that writes a Will leaving everything to her, why, don't know. But it was there. All knew where it was. Who would benefit from the disappearance? I mean there is an allegation made that she stole the safe. If she stole the safe why didn't she take the Will, it benefits her. Everybody knew where it was, it somehow disappeared. Guns disappeared, it disappeared, pictures disappeared, nobody knows who did it.

The only evidence to indicate at all that Mr. Charles, Sr. wanted. . . it's not even saying he wanted to change his Will, he said he got upset that Rosalyn [sic] stopped going the last six weeks of his life. And she said she stopped going because of threats of Rodrick [sic] and she was afraid because she claims that he threatened to kill her. And Ms. Margaret verified that things weren't always so kosher.

Certainly Mr. Midlebrooks, Sr. wasn't in a position to crawl under that mattress and do anything with the Will, well there's certainly no evidence of it. And under the law the presumption can be overcome by sufficient evidence. And certainly here there is sufficient evidence to overcome the presumption that there… first there's none to say he intended to revoke, which all of the cases that I've read indicate there should be something. There's one that clearly the testator had destroyed the Will. There's nothing to indicate again, I don't think everybody is telling the whole story, there's more to this story than I know here today.

But based on the evidence today, the presumption is clearly overcome that he did not, he did not revoke his Will. I mean it's – I wish we had the original, we don't, that's the rule of the court is that the presumption has been overcome, the Will for whatever purpose he left it all to Roselyn [sic], it's valid, objection to the ruling of the court is noted and error is assigned.

## *Assignments of Error One and Two*

Assignments of error one and two are addressed together. Appellant argues the trial court legally erred when it misapplied the *Talbot* standard. He argues that instead of shifting the burden to Juneau to prove the validity of the will, the burden remained on him to prove that the Decedent revoked it. *Talbot* makes clear that the burden is on the proponent of the will to prove that it has not been revoked when a will that the testator had access to is missing.

Juneau argues, however, that the *Talbot* presumption of revocation does not even apply because there was no evidence that the will was "in the possession of, or readily accessible to, the testator." In *Succession of Deshotel*, 09-37, p. 6 (La.App. 3 Cir. 5/6/09), 10 So.3d 873, 878, a panel of this court stated: "[I]n order to have this presumption apply, the record must indicate that the Decedent had the November will in his possession or that it was readily accessible to him prior to his death." Thus, a threshold question that was not addressed at trial is whether the *Talbot* rebuttable presumption even applies. It is a well-recognized precept of the law that "the failure to find a will which was duly executed and in the possession of, or readily accessible to, the testator, gives rise to a legal presumption of revocation by destruction; however, this presumption is a rebuttable one and so may be overcome by sufficient evidence." *Succession of Talbot*, 530 So.2d at 1134-35. If the will is not shown to be readily accessible, no presumption of revocation would apply.

14

The testimony was that the will was kept under Charles's mattress, but it went missing at some point. Juneau testified that she and her father searched for the will but could not find it. Thus, reasonable people could find that the will was not readily accessible to Charles, and the rebuttable presumption of revocation would not even apply.

As in *Deshotel*, we find the issue of whether the presumption even applies is not determinative because Juneau successfully rebutted the presumption of revocation. Even if Charles's testament was readily accessible to him, Juneau could still overcome the presumption of revocation.

Additionally, we do not find the trial court erred in assigning the requisite burdens. While it is true that the trial court stated, "Well first of all *Talbott* [sic] does not say that she has to prove that it was not revoked," it went on to elucidate the *Talbot* factors. Appellant argues that there was "no clear proof that the will was not revoked by the testator." In the same vein, there was no clear proof that he revoked it, such as by tearing it up in front of his attorney as in *Talbot*. A lack of evidence in the record that the Decedent intended to revoke his will is evidence that he did not intend to revoke it. Unlike the clear evidence of a testator tearing up his will and stating he wishes it revoked, it is unlikely that a testator who has no intention of revoking his will is going to randomly pronounce to anyone who will listen that he has no intention to revoke it. We noted that a lack of evidence of an intention to revoke is evidence in *Deshotel* when we stated in regard to the third prong that the will was never revoked: "Finally, there is no evidence in the record that the November will was ever revoked. To the contrary, there is an abundance of evidence that the Decedent wanted the appellees to inherit from him." *Id.* at 879.

15

The remaining issue is whether the trial court erred in finding that Juneau overcame the presumption of revocation. A trial court's finding that presumption of revocation has been rebutted is subject to manifest error review. *Succession of Foster*, 19-209 (La.App. 4 Cir. 7/31/19), 363 So.3d 505, *writ denied*, 19-1401 (La. 11/5/19), 281 So.3d 672; *Succession of Doucet*, 42,963 (La.App. 2 Cir. 2/6/08), 975 So.2d 738. The *Talbot* standard has been described as "a sliding scale of proof sufficient to rebut the presumption depending on the weakness or strength of the evidence surrounding the lost original." *Succession of Altazan*, 96-409, pp. 4-5 (La.App. 1 Cir. 11/8/96), 682 So.2d 1320, 1322. Thus, if reasonable people could find that Juneau met her burden of proving that her father's missing will was not revoked by clear proof, the trial court cannot have committed manifest error.

Rosalind offered testimonial evidence from her daughter, brother, and aunt that her father wished that everything be left to her. Her brother's testimony that Charles was displeased with Rosalind toward the end of his life is not sufficient evidence that he intended to revoke his will. The trial court's credibility determinations were reasonable. While the trial court did find there were definite inconsistencies in the testimony, it particularly found the aunt's testimony credible. Based on our review of the record and the trial court's reasoning, we find that the trial court did not manifestly err in finding there was sufficient evidence of a lack of intent to revoke, and that the Decedent wished to leave his estate to Rosalind. The trial court found that Rosalind successfully rebutted the presumption of revocation, and we find it did not manifestly err in doing so. These assignments of error are without merit.

### *Assignment of Error Three*

In this assignment of error, Appellant argues that no one, including the executrix or the court appointed notary, searched for Decedent's will after he passed. Based on all of the testimony at trial, this search would have been futile because the will was nowhere to be found; other items including the Decedent's safe went missing; and Roderic, who lived with his father and at the home for six months subsequent to his death, found no will either before or after he moved out of the home. We agree with the appellee that there was no evidence to suggest that the lost will would have "suddenly and mysteriously reappeared" after Charles's death, and the trial court did not manifestly err in upholding the probated copy of his will. This assignment of error is without merit.

### CONCLUSION

The judgment of the trial court probating the copy of the will produced by Rosalind Middlebrooks Juneau is affirmed. Costs of this appeal are assessed to the Succession of Charles Ray Middlebrooks, Sr.

**AFFIRMED.**

17